**REVISED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

Nos. 95-30206, 95-30253,
97-30123

UNITED STATES OF AMERICA,

Plaintiff-Appellant - Cross-Appellee,

versus

WILLIAM MULDERIG

Defendant-Appellee - Cross-Appellant.

Appeal from the United States District Court
for the Eastern District of Louisiana

August 15, 1997

Before DAVIS, STEWART, and PARKER, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This case presents the question of whether William Mulderig, a sophisticated and once successful New York entrepreneur, was properly convicted of conspiring to misapply bank funds, make false entries in bank records, and to make false statements to influence a federal agency (Count 1); of making a false statement to a financial institution (Count 2); and of aiding and abetting the misapplication of bank funds (Count 3).[1] Although the jury also found Mulderig guilty on three additional counts of aiding and abetting the misapplication of bank funds (Counts 5, 7, and 8), the

---

[1] Along with Mulderig, the Government obtained convictions for John and Joseph Mmahat. A prior panel of this court affirmed John Mmahat's convictions and affirmed Joseph Mmahat's convictions to the extent they supported the restitution order against him. See United States v. Mmahat, 106 F.3d 89 (5th Cir. 1997).

district court entered a judgment of acquittal on those counts. The Government has cross-appealed that ruling.

After a thorough review of this voluminous record, we AFFIRM Mulderig's convictions in all respects and AFFIRM the district court's judgment of acquittal on Counts 5, 7, and 8.

## BACKGROUND

John and Joseph Mmahat were brothers and chairman and president, respectively, of Gulf Federal Savings Bank (Gulf Federal), a federally insured financial institution located in Metairie, Louisiana. A 1983 federal audit revealed that Gulf Federal was essentially insolvent and that some of its commercial loans were unlikely to be repaid. To artificially decrease the amount of delinquent loans, the Mmahats made two sham loans to shell corporations owned by Mulderig, an attorney and entrepreneur.

The first sham loan stemmed from a transaction involving CPA Associates (CPA), an investment partnership that had acquired, through a Gulf Federal loan, a set of town homes known as Cypress Park. By late 1984, CPA was delinquent on its loan. Instead of foreclosing, the Mmahats arranged for Cypress Park to be purchased by K & K Financial Services (K & K)—which was owned by Mulderig—for $2,069,000; this constituted "repayment" of the CPA loan. Mulderig later submitted to Gulf Federal a financial statement for K & K to complete the necessary loan documentation. The statement, however, did not reflect loans of $1.4 million that another bank had made to K & K in 1984 to finance various Mulderig enterprises.

The second loan was similar. Gulf Federal financed the purchase by Ronald Frank of the Nel Place apartment complex, but Frank became unable to meet his payments. Gulf Federal persuaded Mulderig to buy Nel Place and replace the failing loan with one to Dermul Management (Dermul), one of Mulderig's companies. In 1984, Frank sold Nel Place to Dermul for $1,632,730, and Gulf Federal loaned Dermul that amount plus $971,312.75, secured by a deed of trust for property Mulderig owned in New York. Neither sham loan was repaid, and Gulf Federal went into receivership in November 1986.

2

## PROCEDURAL HISTORY

In the indictment (dated December 16, 1993), Mulderig was charged with conspiring, under 18 U.S.C. § 371, to misapply bank funds (18 U.S.C. § 657), to make false entries in bank records (18 U.S.C. § 1006), and to make false statements to influence a federal agency (18 U.S.C. § 1008) (Count 1); making a false statement to a financial institution (Count 2); and aiding and abetting the misapplication of bank funds (Counts 3, 5, 7, and 8). On November 3, 1994, a jury found Mulderig guilty on all counts. The district court denied Mulderig's motion for judgment of acquittal on Counts 1-3, but granted a judgment of acquittal on Counts 5, 7, and 8.

On June 23, 1995, the district court allowed Mulderig to file a second motion for judgment of acquittal or new trial as to Counts 1-3, and this motion was subsequently denied. In August 1996, the district court granted Mulderig's motion to subpoena documents from federal regulators. Mulderig sought to prove that the Government's preindictment delay was prejudicial and done with the intent of obtaining a tactical advantage over Mulderig. After discovery, Mulderig in October 1996 filed a third Rule 29 and Rule 33 motion for judgment of acquittal or new trial based on alleged newly discovered evidence. However, relying on the Supreme Court's decision in Carlisle v. United States, 116 S. Ct. 1460 (1996), the district court held that it had no jurisdiction to hear Mulderig's Rule 29 and Rule 33 motions.

On December 18, 1996, Mulderig was sentenced to 54 months' imprisonment on Counts 1 and 3 and to five years' probation on Count 2, and ordered to pay restitution in the amount of $1,032,000. That same day, Mulderig filed a timely notice of appeal. The Government timely cross-appealed the district court's decision to grant judgments of acquittal on Counts 5, 7, and 8. On February 1, 1997, Mulderig filed a writ of mandamus asking us to direct the district court to exercise its jurisdiction and rule on Mulderig's third post-conviction motion for judgment of acquittal or new trial. We consolidated the writ of mandamus with Mulderig's direct appeal and the Government's cross-appeal.

## MULDERIG'S PETITION FOR WRIT OF MANDAMUS

Almost two months after the district court sentenced Mulderig and more than two years after his conviction, Mulderig filed a petition for writ of mandamus urging us to order the district court to exercise jurisdiction over Mulderig's third motion for judgment of acquittal or new trial. In the petition, Mulderig contended that "newly discovered evidence" proved his innocence on Counts 1-3. The district court never ruled on the merits of Mulderig's factual contentions because the district court decided that it did not have jurisdiction to rule on the substantive claims raised. We decline to issue the writ.

It is by now well established that mandamus is an extraordinary remedy reserved for those situations in which "the trial court has [1] exceeded its jurisdiction or [2] has declined to exercise it, or [3] when the trial court has so clearly and indisputably abused its discretion as to compel prompt intervention by the appellate court." In re Dresser Indus., Inc., 972 F.2d 540, 543 (5th Cir. 1992) (citation omitted). We shall not issue a writ of mandamus if the petitioner can obtain the relief requested on direct appeal. See McDermott Int'l, Inc. v. Underwriters at Lloyds, 981 F.2d 744, 748 (5th Cir. 1993).

In this case, Mulderig did not seek a writ of mandamus until almost three months after the district court declined to exercise jurisdiction over Mulderig's third, post-conviction motion for judgment of acquittal or new trial and approximately two months after Mulderig was sentenced. Although the district court declined to exercise its jurisdiction (a recognized basis for issuing a writ of mandamus), once Mulderig filed his notice of appeal, the district court lost jurisdiction over this case. See, e.g., United States v. Greenwood, 974 F.2d 1449, 1468-69 (5th Cir. 1992), cert. denied sub nom., Crain v. United States, 508 U.S. 915, 113 S.Ct. 2354, 124 L.Ed.2d 262 (1993). At this point, we cannot put the toothpaste back in the tube. Nonetheless, Mulderig's notice of appeal brought up all orders issued by the district court, Trust Co. of La. v. N.N.P. Inc., 104 F.3d 1478, 1485-86 (5th Cir. 1997) (on rehearing), and so Mulderig's claim that the district court erred in declining to exercise jurisdiction over his Rule 29 and Rule 33 motions can be remedied (if necessary) in his direct appeal.

4

**MULDERIG'S DIRECT APPEAL**

In his direct appeal, Mulderig asserts a number of legal errors committed by the district court. In addition, Mulderig argues that the evidence was insufficient to support convictions on Counts 1-3. We find no legal error and conclude that the evidence was sufficient to support Mulderig's convictions on Counts 1-3. We begin with the legal issues and then proceed to Mulderig's sufficiency claims.

## I.    PREINDICTMENT DELAY

Mulderig argues that the district court committed reversible error by not granting discovery and holding a hearing after the district court made a pre-trial finding that Mulderig suffered actual prejudice from the Government's nine-year preindictment delay. We must decide whether our en banc decision in United States v. Crouch, 84 F.3d 1497 (5th Cir. 1996) (en banc), cert. denied, ---- U.S. ----, 117 S. Ct. 736 (1997) automatically entitled Mulderig to discovery and a hearing once the district court found that Mulderig suffered actual and substantial prejudice from the Government's preindictment delay. We conclude that Crouch does not so hold.

In Crouch, we held that "for pre-indictment delay to violate the due process clause, it must not only cause the accused substantial, actual prejudice, but the delay must have been intentionally undertaken by the government for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other impermissible, bad faith purpose." Id. at 1514. We neither stated nor implied that a defendant who has suffered actual and substantial prejudice as the result of the Government's preindictment delay is automatically entitled to an evidentiary hearing. Thus, we reject Mulderig's assertion that our holding in Crouch stands for the proposition that defense assertions of intentional preindictment delay necessarily trigger the right to discovery and a hearing.

We have held that "an in camera inspection by a district judge is a reasonable procedure and is protective of the defendant's rights." United States v. Killian, 639 F.2d 206, 210 (5th Cir.  Unit A), cert. denied sub nom., Brunk v. United States, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394

5

(1981). Moreover, a district court has the right after in camera inspection to withhold evidence which is irrelevant or not exculpatory. Id. Here, the district court conducted an in camera, ex parte inspection of Government documents and found meritless Mulderig's claim that the Government's preindictment delay was intentionally aimed at obtaining a tactical advantage over Mulderig. The district court thereafter filed the Government documents under seal. We have reviewed the information presented to the district court and conclude that there was no abuse of discretion.

## II.    STATUTE OF LIMITATIONS

Mulderig next argues that Counts 1 and 2 are barred by the applicable statute of limitations. Mulderig specifically asserts that at the time of his trial and sentencing, 18 U.S.C. § 3282 applied, which barred the prosecution, trial, or punishment of a party unless the indictment was brought within five years of the offense charged. In United States v. Barakett, 994 F.2d 1107 (5th Cir. 1993), we held that failure to assert at trial the statute of limitations defense amounts to a waiver of that defense. Id. at 1110. Mulderig concedes that he did not assert the statute of limitations defense until almost 110 days after the trial concluded. Under these facts, we conclude Mulderig has waived the statute of limitations defense.

## III.   THE ALLEGED BRADY VIOLATION

Mulderig also argues that the government violated his rights under Brady v. Maryland, 373 U.S. 83 (1963), by suppressing material, exculpatory evidence. Specifically, he contends that the Government (1) failed to designate two allegedly exculpatory Gulf board resolutions; (2) affirmatively misrepresented the resolutions; and (3) failed to correct false testimony as to the authority of Gulf Federal officials to negotiate the final terms of loans. We disagree.

To establish a Brady violation, a defendant must show, among other things, that the evidence was suppressed by the prosecution. 373 U.S. at 97. However, "[w]hen information is fully available to a defendant at the time of his trial and his only reason for not obtaining and presenting the evidence to the court is his lack of reasonable diligence, the defendant has no Brady claim." United States v. Marrero, 904 F.2d 251, 261 (5th Cir.), cert. denied, 498 U.S. 1000 (1990) (citation omitted). Here,

6

the government gave the defense access to 500,000 pages of documents relating to the case. One box, according to the index of documents, contained "Board Loan Committee Minutes of GFSB, Monthly Reports of GFSB, Board Minutes and Resolutions of GFSB, Executive Committee Minutes of GFSB." Among the documents were two board resolutions that purportedly gave certain officers the authority to negotiate and approve loans on whatever terms they saw fit. Mulderig's counsel copied the contents of the box and inspected the box mid-trial, but did not discover the resolutions until after the trial. After a post-trial evidentiary hearing, the district court found no Brady violation.

In the Mmahat appeal, we analyzed a similar claim and concluded that "there is no authority for the proposition that the government's Brady obligations require it to point the defense to specific documents with a larger mass of material that it has already turned over." United States v. Mmahat, 106 F.3d 89, 94 (5th Cir. 1997). This principle controls here as well.

Mulderig argues that even assuming the government disclosed the resolutions, it violated Brady by misrepresenting the value of the disclosed material and by failing to correct false testimony as to the authority of Gulf Federal officials to negotiate the terms of the loans. See Hughes v. Hopper, 629 F.2d 1036, 1039 (5th Cir. 1980) (noting that defense knowledge of exculpatory evidence may be nullified when "prosecution misleads defense into believing the evidence will not be favorable to the defendant"), cert. denied, 450 U.S. 933 (1981). Before trial, Mulderig and his codefendants requested all Brady material. The government argues that it did not produce the resolutions because it did not view them as exculpatory evidence. Because Mulderig was not a Gulf Federal employee, his case poses a closer call than that in Mmahat. Nevertheless, given that the Mmahats' theory of defense was that they had authority to make questionable loans, Mmahat, 106 F.3d at 94, Mulderig could not have been unaware of the alleged existence of the resolutions. Thus, we conclude that the nondiscovery of the resolutions was due to Mulderig's lack of diligence rather than any affirmative government misbehavior.

## IV.   DENIAL OF A FAIR TRIAL

Mulderig asserts that he was denied a fair trial because of the cumulative effect of the following alleged trial errors: a finding of no preindictment delay; a finding of no <u>Brady</u> violation; denial of a motion for severance; prosecutorial misconduct; and an erroneous evidentiary ruling. We have already rejected Mulderig's first two claims of error. Accordingly, we turn to Mulderig's remaining claims to determine whether Mulderig was denied a fair trial.

A. Denial of Mulderig's Motion for Severance

Mulderig asserts that the district court erred in denying his severance motion because of an alleged "spillover" effect that purportedly occurred through the introduction of numerous civil violations committed by his codefendants. We review the denial of a motion for severance for an abuse of discretion. <u>United States v. Bermea</u>, 30 F.3d 1539, 1572 (5th Cir. 1994).

Rule 8(b) of the Federal Rules of Criminal Procedure authorizes joinder of defendants "if they are alleged to have participated in the same . . . series of acts or transactions constituting an offense or offenses." <u>See</u> <u>United States v. Coppola</u>, 788 F.2d 303, 306 (5th Cir. 1986). We have held that "[i]f defendants have been properly joined, the district court should grant a severance only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable determination of guilt or innocence." <u>United States v. Bermea</u>, 30 F.3d at 1572. "[T]he mere presence of a spillover effect," we have reasoned, "does not ordinarily warrant a severance." <u>United States v. Sparks</u>, 2 F.3d 574, 583 (5th Cir. 1993), <u>cert. denied</u>, 510 U.S. 1080 (1994).

We have reviewed the record and perceive no evidentiary basis for Mulderig's conclusion that damaging evidence presented against the Mmahats prevented the jury from making a reliable determination of Mulderig's guilt. Because Mulderig was an outsider to the bank, evidence of internal acts of deception could not have implicated Mulderig, especially because (1) Counts 1, 3, 5, 7, and 8 of the indictment required a finding of intent on Mulderig's part, (2) Mulderig was the only person charged in Count 2, and (3) the jury was instructed to give separate, individual consideration to the charges against each defendant. There was no abuse of discretion.

8

### B. Alleged Prosecutorial Misconduct

Mulderig also argues that the Government failed to disclose information that would "seriously damage" the credibility of two of its key witnesses, failed to correct inaccurate testimony by one of its witnesses, failed to disclose an FBI agent's statement that documents had been lost, and presented improper argument to the jury. We have held that a new trial is warranted only when prosecutorial misconduct is so pronounced and persistent that it permeates a trial's atmosphere and casts serious doubt on the correctness of the jury's verdict. United States v. Castillo, 77 F.3d 1480, 1497 (5th Cir.), cert. denied, 117 S. Ct. 180 (1996); United States v. Wallace, 32 F.3d 921, 926 (5th Cir. 1994). We have reviewed the record and find that these four incidents in no way cast doubt on the correctness of the jury's verdict.

### C. The Allegedly Erroneous Evidentiary Ruling

Finally, Mulderig contends that the district court erred when it admitted a 1988 affidavit in which Mulderig asserted that he was liable only for attorneys' fees, interest, and costs associated with an $850,000 guaranty for the Dermul loan, and not the entire $850,000. The district court also declined to take judicial notice of Gulf's civil suit against Mulderig in which the district court held that Mulderig was liable for the entire $850,000 guaranty.

We review the district court's evidentiary rulings for an abuse of discretion. United States v. Asibor, 109 F.3d 1023, 1032 (5th Cir. 1997). In deciding to admit the 1988 affidavit, the district court analyzed the relevancy of the affidavit pursuant to Rule 401 of the Federal Rules of Evidence and concluded that it was relevant because it tended to show Mulderig's state of mind at the time he executed the guaranty; the district court also excluded as irrelevant the decision in the civil suit. See Gulf Federal Savings & Loan Ass'n v. Mulderig, 742 F. Supp. 358 (E.D. La. 1989). We find that the district court did not abuse its discretion because we simply fail to see how a subsequent judicial determination of liability on the $850,000 guaranty is relevant to Mulderig's state of mind at the time he executed that guaranty.

In sum, Mulderig argues that even if no single claim entitles him to relief, the sum of the legal errors committed by the district court equals a denial of a fair trial. Our arithmetic, however, is somewhat different. We have concluded that none of Mulderig's challenges to the district court's legal conclusions has merit. Accordingly, we affirm the district court's conclusion that Mulderig received a fair trial.

## V. THE DISTRICT COURT'S DENIAL OF MULDERIG'S THIRD POST-TRIAL MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL

Mulderig spent two years after he was convicted trying to get his convictions on Counts 1-3 reversed. Mulderig filed three post-verdict motions for judgment of acquittal in the district court, and we must determine whether the district court properly declined to exercise jurisdiction over the third and final motion. Relying on Carlisle v. United States, 116 S. Ct. 1460 (1996), the district court concluded that "Carlisle is controlling on the issue before the Court as Carlisle states in clear and forceful language that a district court must strictly adhere to the time limits set forth in Rule 29. The Court finds that the facts of the present case are indistinguishable from the facts of Carlisle and that defendant's motions are therefore barred by the time limits of Rule 29(c)."

Mulderig contends that the district court erroneously relied on Carlisle for its conclusion that his third—in Mulderig's words, "renewed"—motion was time-barred. We note at the outset that there is some ambiguity about whether Mulderig's third post-trial motion really sought two alternative remedies (i.e., judgment of acquittal pursuant to Rule 29 or new trial pursuant to Rule 33). For example, Mulderig's motion did not reference Rule 33 at all and did not explicitly state that he wanted a new trial; rather, Mulderig sought complete relief—an outright acquittal on Counts 1-3. During the hearing on the motion, however, Mulderig and the Government spent some time arguing about whether the evidence proffered by Mulderig was in fact "newly discovered," a requirement found in Rule 33.

Under the circumstances, we conclude that Mulderig asserted both a Rule 29(c) motion for judgment of acquittal and a Rule 33 motion for a new trial based on newly discovered evidence. It is less clear still whether the district court actually ruled on Mulderig's Rule 33 motion for a new trial.

Although the district court itself characterized Mulderig's third motion as a motion for judgment of acquittal or new trial (thus implicating Rule 29 and Rule 33), the district court did not distinguish between the two remedies in its determination of whether it had jurisdiction to grant a judgment of acquittal or a new trial. In fact, in its written order denying the motion, the district court did not even mention Rule 33 or refer specifically to Mulderig's claim of newly discovered evidence.

Moreover, Rule 29 and Rule 33 differ in one significant respect for purposes of this appeal: the seven-day time period for Rule 33 motions not based on newly discovered evidence is identical to the seven-day time period in Rule 29. However, Rule 33 motions based on newly discovered evidence are not governed by a seven-day time frame; rather, a defendant has two years to file such a motion. Plainly, whether or not Mulderig's Rule 33 motion is premised on newly discovered evidence is critical because two different time limitations are potentially triggered.

Because the parties argued at length about Mulderig's alleged newly discovered evidence, we construe the district court's denial of Mulderig's third motion as holding that the evidence proffered by Mulderig was not newly discovered, thus triggering the seven-day time limit in Rule 33. Accordingly, we hold as follows: (1) we affirm the district court's conclusion that under Carlisle, Mulderig's Rule 29(c) motion for judgment of acquittal is time-barred; (2) the district court erred in concluding that the evidence presented in the third motion was not newly discovered; and (3) the district court's error is not fatal to the Government because the failure to discover the new evidence prior to or during trial was the result of a lack of due diligence on Mulderig's part.

A.    Rule 29(c) and Carlisle

Before we address the question of whether the district court erred in its application of the Supreme Court's decision in Carlisle, we first present a brief chronology of the post-trial legal wrangling leading up to Mulderig's third, post-verdict motion for judgment of acquittal.

11

### 1.    Three Bites at the Apple

On November 3, 1994, Mulderig was convicted on all counts in which he was charged (Counts 1-3, 5, 7, and 8). On November 10, 1994, Mulderig moved for an extension of time within which to file a post-trial Rule 29 motion for judgment of acquittal. The district court granted the motion and gave Mulderig until November 29, 1994 to file the motion. The parties do not dispute that this motion for an extension of time was filed within the seven-day time frame prescribed by Rule 29 and that the district court had jurisdiction to grant such an extension. The Rule 29 motion was timely filed and subsequently denied on February 2, 1995.

Exactly three months after the district court denied Mulderig's first Rule 29 motion, Mulderig moved for leave to subpoena records in the custody of the New Orleans law firm of Stone, Pigman, Walther, Wittman and Hutchinson, which represented federal bank regulators in civil litigation involving Gulf Federal. The district court granted the motion on May 24, 1995. That same day, Mulderig sought leave to file a second Rule 29 motion for judgment of acquittal as to Counts 1-3. On June 23, 1995, the district court granted Mulderig leave to file the motion and continued Mulderig's sentencing pending our en banc consideration of United States v. Crouch, 84 F.3d 1497 (5th Cir. 1996), cert. denied, 117 S. Ct. 736 (1997). Mulderig's second motion was denied on July 27, 1995.

On August 22, 1995, with leave from the district court, Mulderig "renewed" his second post-trial motion for judgment of acquittal as to Counts 1 and 2. On September 14, 1995, this motion was denied. On July 16, 1996, following our en banc decision in Crouch, the district court ruled that Mulderig's renewed motion for judgment of acquittal was moot, and sentencing was scheduled for September 4, 1996.

Not to be deterred, on August 8, 1996, Mulderig moved for leave to subpoena records in the custody of federal bank regulators. That motion was granted on August 30, 1996. On October 16, 1996, Mulderig filed a third, post-trial motion for judgment of acquittal as to Counts 1-3. This time, Mulderig argued that evidence discovered pursuant to the bank regulator subpoenas was newly

discovered and demonstrated his innocence on Counts 1-3. The district court, however, denied the motion on the ground that the Supreme Court's decision in Carlisle divested it of jurisdiction to rule on Mulderig's third, post-trial motion for judgment of acquittal.

> 2.    Analysis

We review de novo the district court's legal conclusion that it had no jurisdiction to entertain Mulderig's third post-trial motion for judgment of acquittal. See Matter of Advisory Comm. of Major Funding Corp., 109 F.3d 219, 222 (5th Cir. 1997). We conclude that the district court was correct.

Rule 29 states that a motion for judgment of acquittal "may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7-day period." Fed. R. Crim. P. 29(c) (emphasis added). In Carlisle, the defendant filed a Rule 29 motion for judgment of acquittal ten days after he was convicted and the jury was discharged. The Supreme Court strictly construed the seven-day time limitation in Rule 29 and held that the district court did not have jurisdiction to hear the motion. 116 S. Ct. at 1464. The Carlisle Court's admonition to lower courts was plain enough:

> These Rules [i.e., Rules 29 and 45(b)] are plain enough. If, as in this case, a guilty verdict is returned, a motion for judgment of acquittal must be filed, either within seven days of the jury's discharge, or within an extended period fixed by the court during that 7-day period. There is simply no room in the text of Rules 29 and 45(b) for the granting of an untimely postverdict motion for judgment of acquittal, regardless of whether the motion is accompanied by a claim of legal innocence, is filed before sentencing, or was filed late because of attorney error.

Id. at 1464 (emphasis added).

A straightforward application of Carlisle compels the conclusion that the district court was without jurisdiction to consider any of Mulderig's post-trial motions for judgment of acquittal after the district court granted Mulderig an extension to time (until November 29, 1994) to file his (first) post-trial motion for judgment of acquittal—an extension of time that was properly granted within the seven-day period specified in Rule 29. The district court therefore did not err in declining to exercise jurisdiction over Mulderig's third, post-trial motion for judgment of acquittal, filed almost

13

two years after the jury convicted him. We shall not address in any detail Mulderig's (wholly unpersuasive) arguments to the contrary, except to say that Mulderig's creative attempts to circumvent the unambiguous teaching of Carlisle simply rehash arguments that were rejected in Carlisle and border on "mak[ing] a farce" of the time limitations in Rule 29(c). Carlisle, 116 S. Ct. at 1464.

B.     Rule 33 and the So-Called "Newly Discovered" Evidence

The district court's ruling regarding Mulderig's Rule 33 motion stands on a somewhat different footing. As we have repeatedly said, "[m]otions for new trials based on newly discovered evidence are disfavored by the courts and therefore are viewed with great caution." United States v. Sullivan, 112 F.3d 180, 182-83 (5th Cir. 1997) (internal quotations and citations omitted). As such, we have erected a relatively difficult standard—known as the "Berry Rule"—that defendants must meet to obtain a new trial. Mulderig must show (1) that the evidence was newly discovered and unknown to the defendant at the time of trial, (2) that his failure to discover the evidence was not the result of a lack of due diligence, (3) the evidence is material and not merely cumulative or impeaching, and (4) the evidence will probably produce an acquittal. United States v. Sullivan, 112 F.3d at 183 (quoting United States v. Ardoin, 19 F.3d 177, 181 (5th Cir.), cert. denied, 513 U.S. 933, 115 S.Ct. 327, 130 L.Ed.2d 287 (1994).

Mulderig claims that the following pieces of "newly discovered" evidence demonstrate his innocence on Counts 1-3:

> (1) files from loan officer Farley "demonstrate conclusively" that the February 1985 cover letter (allegedly attached to the July 1984 financial statement) was sent to Gulf Federal in connection with an $800,000 construction loan that was separate and apart from the K & K loan at issue in the indictment; thus, argues Mulderig, he was wrongly convicted of submitting a false financial statement to government regulators (Count 2);[2]
>
> (2) although the jury was led to believe that the July 1984 financial statement was the "only" statement found in Gulf Federal's files, documents discovered post-trial (from Farley's desk) suggest that Gulf Federal's files were purged, thereby rendering

---

[2]Mulderig also claims that because the conspiracy charge in Count 1 included the filing of the July 1984 financial statement, his conviction on Count 1 should also be reversed.

14

unreasonable the inference that the July 1984 statement was attached to the February 1985 cover letter; and

(3) an internal memorandum from Gulf Federal's insurers purportedly establishes that Mulderig was wrongly convicted on Count 3 because the second mortgage requirement on the Nel Place loan was "waived" by Gulf Federal officials prior to the loan closing.

Rule 33 of the Federal Rules of Criminal Procedure provides in part as follows:

A motion for new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, . . . A motion for new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7-day period.

(Emphasis added.) The district court concluded that the three pieces of evidence we have outlined above were not newly discovered, thereby subjecting Mulderig to the seven-day time limit. We have reviewed the record and conclude that the district court erred in so concluding because the evidence uncovered through the August 1996 subpoena was unknown to Mulderig at trial; it is therefore "newly discovered," thereby triggering the two-year time limit in Rule 33. And because Mulderig's third post-trial motion was filed within two years after the jury returned verdicts of guilt on Counts 1-3, Mulderig's Rule 33 motion was timely.

However, we hold that Mulderig's failure to unearth the newly discovered evidence was due to a lack of due diligence on his part. For the second time in recent memory, we are presented with defense claims of government foul play in a paper-intensive criminal prosecution for violations of federal banking laws. In United States v. Sullivan, 112 F.3d 180, we held that defense counsel's claim of due diligence failed largely because defense counsel was made well aware early in the trial of the Government's theory of criminal intent, yet did not at all investigate a key Government theory of guilt. Id. at 183. The reasoning in Sullivan applies with equal force here.[3]

As to the first two pieces of evidence, our review of the record convinces us that the issue of whether Mulderig actually submitted the July 1984 financial statement in February 1985 was hotly contested. Mulderig knew from the day the indictment was handed down that Count 1 included as

---

[3]We express no opinion on whether the newly discovered evidence demonstrates Mulderig's innocence on Counts 1-3.

15

part of the conspiracy the filing of the July 1984 statement as part of the conspiracy, and that the sole indictable offense in Count 2 was the filing of the (false) July 1984 K & K financial statement in order to paper the record for the Cypress Park loan. In addition, Mulderig's own attorney at a side-bar conference stated that "Mr. Farley is one of the most important witnesses in this case." Yet, Mulderig's attorneys never expressed surprise when the incriminating evidence came in, never sought a continuance to explore the matter further,[4] and never sought to obtain every document (in a document-intensive prosecution) from, in Mulderig's own words, "one of the most important witnesses in this case." We find a lack of due diligence here. See, e.g., United States v. Sullivan, 112 F.3d at 183.

Our conclusion is the same with regard to the third piece of newly discovered evidence. There can be no doubt that throughout this trial the issue of whether Mulderig was required to provide a second mortgage to secure the Nel Place loan was repeatedly raised. Furthermore, and perhaps more importantly, the issue of whether certain loan requirements could be waived was also the subject of testimony presented to the jury. But as with the first two pieces of newly discovered evidence, the failure to provide a second mortgage to secure the Nel Place loan was charged in the indictment, Mulderig showed no surprise at the introduction of evidence about the second mortgage requirement, did not seek a continuance, and did not investigate the waiver issue further. We conclude that Mulderig's failure to discover an alleged waiver of the second mortgage requirement resulted from a lack of due diligence on his part.

## VI. SUFFICIENCY OF THE EVIDENCE

We finally come to the sufficiency question. This is a circumstantial evidence case pure and simple. It is by now well settled that a defendant seeking reversal on the basis of insufficient evidence swims upstream. We must affirm a judgment of conviction if a reasonable jury could conclude that

_____

[4]We note that Mulderig did seek and was denied a pre-trial continuance. However, Mulderig did not base his motion for a continuance on the issues raised now.

the Government proved each element of the crime charged beyond a reasonable doubt. United States v. Mmahat, 106 F.2d at 97. We view the evidence in the light most favorable to the verdict and indulge all reasonable inferences in favor of the verdict. Id. Of course, the evidence need not exclude every possible theory of innocence, United States v. Faulkner, 17 F.3d 745, 768 (5th Cir.), cert. denied, ---- U.S. ----, 115 S. Ct. 193, 130 L.Ed.2d 125 (1994), and we will reverse a conviction in a circumstantial evidence case if the evidence points equally to a theory of innocence and guilt, United States v. Sultan, ---- F.3d ----, ---- (5th Cir. 1997) (quoting United States v. Jaramillo, 42 F.3d 920, 923 (5th Cir. 1995)). We review de novo a denial of a judgment of acquittal and search the record for evidence to support the convictions beyond a reasonable doubt. United States v. Myers, 104 F.3d 76, 78 (5th Cir.), cert. denied, 117 S. Ct. 1709 (1997). In so doing, we apply a "rule of reason," knowing that the jury may properly rely on their "common sense" and "evaluate the facts in light of their knowledge of the natural tendencies and inclinations of human beings." United States v. Ayala, 887 F.2d 62, 67 (5th Cir. 1989).

In this complex case, the competing theories offered to the jury were actually quite simple. The Government argued that Mulderig acted in concert with the Mmahats to "cook the books," leading federal regulators to believe (falsely) that Gulf Federal was on sound financial footing. Mulderig, on the other hand, contended that he had no idea that the Mmahats were engaged in foul play, that he merely negotiated a favorable business deal with regard to the loans in question, and that he simply failed in his attempt to transform bad investments into good ones.

We conclude that the circumstantial evidence presented by the Government points inexorably to the conclusion that a reasonable jury could have found Mulderig guilty beyond a reasonable doubt on Counts 1-3. We discuss the evidentiary basis for each conviction separately.

A.    Count 1—Conspiracy to Misapply Bank Funds, to Make False Entries in Bank Records, and to Make False Statements to Influence a Federal Agency

To prove a conspiracy in violation of 18 U.S.C. § 371, the Government had to prove three elements beyond a reasonable doubt: (1) that two or more people together agreed to pursue an unlawful objective, (2) that the defendant knowingly agreed to join the conspiracy, and (3) that one

17

of the members of the conspiracy performed an overt act in furtherance of that conspiracy. United States v. Faulkner, 17 F.3d at 768. The Government need not rely only on direct evidence of a conspiracy; each element may be proven by circumstantial evidence. United States v. Casilla, 20 F.3d 600, 603 (5th Cir. 1994). Once a conspiracy has been proven, the Government need only present "'slight evidence'" linking the defendant to the conspiracy, United States v. Leonard, 61 F.3d 1181, 1187 (5th Cir. 1995) (quoting United States v. Duncan, 919 F.2d 981, 991 (5th Cir.), cert. denied, 500 U.S. 926 (1991)), although "mere . . . association with participants in criminal activity, without more, cannot serve as a basis for a conviction," United States v. Sultan, ---- F.3d at -----.

Mulderig does not dispute that the Mmahats engaged in a conspiracy to defraud federal regulators.[5] Mulderig does argue, however, that he did not knowingly participate in that conspiracy. He contends that the Government produced no evidence that Mulderig (1) knew Gulf Federal was under the watchful eye of federal regulators, thereby furthering the cover-up of nonperforming loans; (2) had a conversation with anyone in which Mulderig was asked to assume the two delinquent loans for the purpose of hiding them from federal regulators; and (3) knew about the improper purpose for which Gulf Federal had Mulderig purchase the two loans.

The district court denied Mulderig's motion for judgment of acquittal on the ground that a reasonable jury could have concluded that Mulderig conspired with the Mmahats because Mulderig knew that the two loans were problematic for Gulf Federal, that Mulderig knew Gulf Federal wanted to wipe the loans from the books by the end of 1984, and that Mulderig agreed to supply the paperwork necessary to achieve these objectives.

The evidence was sufficient to support Mulderig's conviction on Count 1. At the December 28 closing, there was some discussion about "clean[ing] up house" for federal bank examiners, who were at Gulf Federal at the time of the K & K and Dermul closings. According to David Lichtenstein,

---

[5]Nor could he. We affirmed the Mmahats' convictions (the principal conspirators), United States v. Mmahat, 106 F.3d 89, and it would be an unusual result indeed if we were to conclude here that the evidence was insufficient to support a finding that the Mmahats conspired to defraud federal regulators.

Mulderig "indicated that he knew what [documentation] the examiners would need and would help [Gulf Federal] to come up with what was needed . . . to complete [Gulf Federal's] file after the fact."[6] This testimony was substantially corroborated by a deposition Mulderig gave in 1988, in which he stated the following: "'I know about examiners. With every banker I've ever met, they [are] always concerned that they have a file that will pass muster with the federal examiner.'" Consistent with Mulderig's knowledge of what bank examiners needed to see (and as we explain more fully below), he filed a false financial statement after the closing of the Cypress Park loan, which omitted over $1 million in loans incurred by K & K.

The evidence also showed that Mulderig was a sophisticated businessman with considerable experience in obtaining commercial loans. Yet, the record reveals that many of the documents customarily required for disbursement of commercial loans (like the K & K and Dermul loans) were either missing or incomplete. For example, Marie Sciortino testified that (1) Mulderig's December 15, 1985 financial statement noted his net worth at $13.9 million but did not list any liabilities; (2) Mulderig's November 30, 1984 financial statement was not signed;[7] and (3) Mulderig never provided Gulf Federal with income information for himself or K & K. Sciortino's testimony was corroborated by a number of other witnesses. And federal examiners Jerry Landry and John Weins testified that they were unable to locate a title opinion or title insurance for the K & K and Dermul loans, thereby suggesting that Mulderig was knowingly purchasing property without any concern whatsoever about encumbrances that could seriously diminish the value of the Cypress Park and Nel Place properties.

David Lichtenstein also testified that after Mulderig was told that a New Orleans appraiser could not produce the numbers Mulderig wanted on the Nel Place property, Mulderig suggested that

---

[6]Mulderig's attorney did little to take the sting out of this testimony. In response to a defense suggestion that it was "literally unbelievable" that Mulderig would know what documents bank examiners needed to see, Lichtenstein said that Mulderig was "a very seasoned businessman" who "made a lot of loans" and therefore "understood what kind of requirements were needed."

[7]Sciortino testified that the November 1984 financial statement listed $3.5 million for which Mulderig was "jointly and severally liable." Sciortino stated, however, that she did not know whether this statement referred to the $1.4 million in loans Mulderig had assumed since July 1984.

Jack Bernholz, a Miami appraiser, could use a shared-equity-plan basis for the appraisal of Nel Place and thereby increase the value of the property to support the contemplated loan. Birnholz's appraisal, conducted for Mulderig himself, flew in the face of the well-established practice of providing appraisals for banks, not borrowers.[8]

Finally, Mulderig left Gulf Federal with almost $5 million in loans to purchase real estate without having to put a single penny down, something (to say the least) that was considered "unusual"; he knew the Cypress Park and Nel Place loans were problematic for Gulf Federal; he knew that he had Gulf Federal "over a barrel"; and although Gulf Federal had previously declined to loan Mulderig $850,000 to buy stock in a Pennsylvania or New York bank, Mulderig walked away from the Nel Place deal with $971,000 over and above the purchase price of the Nel Place property.

In light of all of this circumstantial evidence, a reasonable jury certainly could have concluded that although Mulderig got a "sweet" business deal, that deal—which wiped problematic loans off Gulf Federal's books—was intended to assist the Mmahats in deceiving federal regulators into believing that Gulf Federal's financial condition was better than it actually was.

B.    Count 2—Making a False Statement to a Financial Institution

To convict Mulderig on Count 2, the Government had the burden of proving beyond a reasonable doubt that Mulderig submitted a financial statement containing a false statement, that the false statement was material, and that Mulderig submitted the false statement knowingly and willfully, with the specific intent to influence the FSLIC. Former 18 U.S.C. § 1008 (repealed in 1989).

The parties hotly contest whether Mulderig submitted a false financial statement to Gulf Federal with the intent to dupe federal regulators into thinking that K & K was sound financially. A "Pro Forma Statement of Condition" for K & K dated July 23, 1984 omits over $1 million in loans that were incurred after July 23, 1984. This July 23, 1984 financial statement lies at the center of the controversy over Mulderig's conviction on Count 2. Specifically, on February 12, 1985, Mulderig sent a letter to Gulf Federal, which stated in part as follows: "Enclosed please find financial

_____

[8]The jury was also made aware of a number of other defects in the Birnholz appraisal.

20

statements regarding William M. Mulderig and K&K Financial Services, Ltd." (Emphasis added.) The Government in this appeal and the district court when it ruled on Mulderig's motion for judgment of acquittal reason that the February 12, 1985 letter was a "cover letter" to the July 23, 1984 K & K financial statement and that in February 1985, the K & K statement was false. Mulderig, on the other hand, argues that the July financial statement was literally true and that even if it was false, the Government failed to produce any evidence that the July 1984 statement was attached to the February 1985 "cover letter."

The Government has the better argument. First, Mulderig's contention that the July 1984 financial statement was literally true is beside the point because it is undisputed that as of February 1985, K & K had approximately $1.4 million in outstanding loans, loans that did not appear on the July 1984 statement, loans that were not brought to the attention of Gulf Federal, and loans that should have been brought to Gulf Federal's attention. From this evidence, a reasonable jury could have concluded that Mulderig's after-the-fact filing of an incomplete financial statement was done for the purpose of convincing federal regulators that the K & K loan was properly documented and disbursed to a financially sound institution. See, e.g., United States v. Stephens, 779 F.2d 232, 237 (5th Cir. 1985) (upholding conviction when defendant omitted loans from financial statement even though loans were made after date of statement).

Second, the circumstantial evidence presented by the Government shows that a reasonable jury could have concluded that the July 23, 1984 K & K statement was submitted with the February 1985 cover letter. In a memorandum from Peggy Boudreaux to Lichtenstein, Boudreaux lists various documents missing from the K & K loan file, one of which was "financials." On January 23, 1985, Lichtenstein asked Boudreaux to forward the memorandum to Farley, who recalled receiving the information. At the end of January 1985, Farley planned a trip to New York to visit Mulderig, and he prepared an itinerary of "things that needed to be covered." On that list was the notation "financials on K & K Financial Services Limited." Then came the February 12, 1985 cover letter,

which stated that a K & K financial statement was "[e]nclosed."[9]  Under these facts, a reasonable jury

could have concluded that Farley went to New York, asked Mulderig for a K & K financial statement,

and that the February 1985 letter included that statement.[10]

Finally, we hold that a reasonable jury could have concluded that the July 1984 K & K

financial statement was the particular statement submitted to Gulf Federal in February 1985.  We have

reviewed the record and have not found any other K & K financial statement except the July 1984

statement.

C.     Count 3—Aiding and Abetting the Misapplication of Bank Funds by Failing to Obtain Adequate Collateral on the Dermul Loan

Mulderig argues that the evidence was insufficient to support the conviction on Count 3

because the Government failed to offer enough evidence that Gulf Federal's loan committee imposed

---

[9]Darla Seaman, Mulderig's office manager, paralegal, and administrative assistant testified that every financial statement requested by banks had to be (and were) authorized by Mulderig himself before the statement was sent to the requesting bank.

[10]Mulderig makes much of the fact that the cover letter was not attached to the K & K financial statement, and that therefore the July 1984 financial statement could not have been included with the February 1985 cover letter.  The argument has no merit because the undisputed evidence showed that the cover letter may not have been forwarded to the Credit Department along with the financial statement.

Mulderig also argues that he engaged in no foul play because he disclosed his liabilities in a personal financial statement on file with Gulf Federal.  Mulderig's contention is meritless.  For starters, Mulderig's disclosed his liabilities in lump-sum fashion,  stating that he was "jointly and severally liable for bank loans and credit of $3.5 million of several partnerships."  Expert Ronald Hall testified that although such a reporting may be acceptable, it may prevent a lender from doing a thorough analysis of the creditworthiness of a borrower.  Second, and perhaps most importantly, Hall informed the jury that financial statements submitted by corporations should reflect the corporation's liabilities at the time the statements are submitted to a bank.

Finally, at one point, Farley testified that he could not recall whether he had a K & K financial statement at the time of the Cypress Park closing.  Mulderig's attorney, however, attempted to impeach this testimony by presenting Farley with deposition testimony Farley gave in 1988, in which he (Farley) stated that he did in fact have a K & K financial statement at the closing on December 28, 1984.  Presumably, if Farley had the statement in his possession in December 1984, that fact would lend credence to Mulderig's claim that he did not submit the July 1984 K & K statement for the Cypress loan in February 1985.

The jury, however, did not see it that way.  As Mulderig well knows, credibility calls are for the jury, and based on the evidence presented, the jury could reasonably have concluded that Farley did not have a K & K financial statement as of December 28, 1984.  A number of other witnesses testified that after the first of the year (1985), Gulf Federal had yet to receive a financial statement from K & K and Farley was specifically instructed to travel to New York to see Mulderig and obtain such a statement.

22

on Mulderig a requirement to obtain a second mortgage on property in Goshen, New York. We reject this contention.

Because another panel of our court has concluded that the evidence was sufficient to support the Mmahats' conviction on misapplying bank funds by failing to obtain adequate collateral on the Dermul loan, United States v. Mmahat, 106 F.3d at 97-98—a finding we cannot disturb here—the sole question we face is whether Mulderig aided and abetted the Mmahats in committing the offense. To support a conviction for aiding and abetting, the Government must prove beyond a reasonable doubt that "[1] the defendant's act [or actions] contributed to the execution of the criminal activity and [2] that he intended to aid in its commission." United States v. Sultan, ---- F.3d at ----- n.4 (citing United States v. Stovall, 825 F.2d 817, 827 (5th Cir. 1987)). A reasonable jury could have concluded that Mulderig promised to provide a second mortgage on the New York property with no intent of ever providing it.

Mulderig knew that he was required to provide a second mortgage on property in New York because that issue was the subject of much discussion at the closing. In fact, Mulderig himself provided input to Valerie Oxner, the closing attorney, in the form of a description of the New York property. Moreover, the record shows that the agreement to provide the second mortgage was intended to protect the interests of Gulf Federal. Yet, as of March 1985, Mulderig had not yet provided that second mortgage, even though the Dermul loan proceeds had been disbursed to him. Because Mulderig was an experienced borrower, the jury could have reasonably concluded that he intended to aid the Mmahats in failing to obtain adequate security for the Nel Place loan.

## THE GOVERNMENT'S CROSS-APPEAL

In its cross-appeal, the Government argues that the district court erred in granting Mulderig's post-verdict motion for judgment of acquittal on Counts 5, 7, and 8. We cannot agree.

We owe no deference to the district court's decision to grant a post-verdict judgment of acquittal on Counts 5, 7, and 8. See United States v. Baytank (Houston), Inc., 934 F.2d 599, 616 (5th Cir. 1991). Instead, we must decide "'whether the relevant evidence, viewed in a light most

23

favorable to the Government, could be accepted by a jury as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.'" Id. (quoting United States v. Varkonyi, 611 F.2d 84, 85 (5th Cir.), cert. denied, 446 U.S. 945, 100 S. Ct. 2173, 64 L.Ed.2d 801 (1980)). As with sufficiency-of-the evidence review, the evidence need not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt . . . . A jury is free to choose among reasonable constructions of the evidence." Id.

## I.   COUNT 5—AIDING AND ABETTING THE MISAPPLICATION OF BANK FUNDS BY DISBURSING THE K & K LOAN

We held in United States v. Mmahat, 106 F.3d 89 that loan committee approval had not been obtained for the K & K loan. Accordingly, to convict Mulderig of aiding and abetting, the Government was required to prove beyond a reasonable doubt that Mulderig intended to aid the Mmahats in disbursing the K & K loan without committee approval.

The record is devoid of direct or circumstantial evidence that could have supported a conviction on Count 5. The record shows that communications between Gulf Federal representatives and Mulderig indicated that Gulf Federal would go forward with the K & K loan. For example, by letter dated December 5, 1984, Farley wrote Mulderig, informing him that Gulf Federal "will certify the thirty units of the [Cypress Park property] . . . are termite free. At this time, you may proceed with your plans of selling the units in good faith." The Government simply failed to present evidence that Mulderig had any reason to believe that the K & K loan was not approved by the loan committee. Just because Mulderig was an experienced borrower, drove a hard bargain at the closing, and negotiated terms and conditions of the K & K loan on the day of the closing does not permit the inference that Mulderig somehow knew that the K & K loan had not been approved. Loan approval, and the process leading up to it, was a matter of internal procedure at Gulf Federal. The only evidence of Mulderig's knowledge of Gulf Federal's internal loan-approval procedure pointed to future approval of the K & K loan and not the absence of it. Accordingly, we affirm the district court's judgment of acquittal on Count 5.

**II.** **COUNTS 7 AND 8—AIDING AND ABETTING THE MISAPPLICATION OF BANK FUNDS BY DISBURSING THE ATTORNEYS' FEES LOAN ON THE DERMUL TRANSACTION (COUNT 7) AND DISBURSING THE ATTORNEYS' FEES ON THE K & K TRANSACTION (COUNT 8)**

The evidence was insufficient to support the convictions on Counts 7 and 8 for largely the same reasons supporting our conclusion on Count 5. We have combed the record and have found no direct or circumstantial evidence that would permit a jury to properly infer that Mulderig knew that the attorneys' fees loans did not receive loan committee approval.

## CONCLUSION

Because we find no legal error and because we find the evidence sufficient to support Mulderig's convictions on Counts 1-3, we AFFIRM Mulderig's convictions in all respects. Because we further find that the evidence was insufficient to support convictions on Counts 5, 7, and 8, we AFFIRM the district court's judgments of acquittal on those counts.