# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 31, 2023

Lyle W. Cayce
Clerk

No. 21-30638

Terry L. Terry,

*Petitioner—Appellant*,

*versus*

Tim Hooper, *Warden, Louisiana State Penitentiary*,

*Respondent—Appellee*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:18-CV-812

Before Smith, Higginson, and Willett, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

In 2010, Terry L. Terry was convicted of three counts of juvenile molestation in violation of La. Rev. Stat. § 14:81.2. Presently before us is Terry's appeal of the denial of his § 2254 petition challenging those convictions and his sentence—specifically, his claim on appeal that the evidence at trial was legally insufficient for a conviction on the last count. Mindful of the high threshold of deference for federal habeas proceedings and the corroborating evidence available at trial, we find that the state court was not objectively unreasonable in rejecting Terry's sufficiency challenge. Accordingly, we AFFIRM.

No. 21-30638

## I.

Having been molested by Petitioner Terry L. Terry as children, Terry's two, now adult, daughters, A.L. and T.C., became concerned when they learned in 2008 that Terry had remarried and now lived in the same house with two young children. Afraid that Terry might repeat his behavior, A.L. and T.C. contacted the Department of Children and Family Services (DCFS),[1] but were told that DCFS could do nothing about the children in Terry's care unless they pressed charges. A.L. called the police to file a complaint against Terry on June 16, 2008. It was discovered that Terry's nephew's children were staying with him. In response to A.L.'s complaint and in conjunction with law enforcement, DCFS scheduled interviews on June 19, 2008, for the children with the Gingerbread House, a children's advocacy nonprofit whose main purpose is to conduct forensic interviews of children who are suspected of having been physically or sexually abused.

During her interview, the youngest of Terry's nephew's three children, S.B., disclosed that she had been "squeezed" and "pinched" in the butt and the vagina by "Terry Terry Terry." S.B. also explained that the touching occurred underneath her clothes, while she had gone to bed, and that such touching occurred more than once. The next day, a brief follow-up interview was conducted of S.B., during which the interviewer clarified where the touching occurred. Terry was subsequently arrested.

The State of Louisiana charged Terry with three counts of juvenile molestation: Count I alleged that Terry molested his daughter, A.L., during 1985 to 1994; Count II alleged that Terry molested his daughter, T.C., during

---

[1] In testimony, A.L. referred to DCFS instead as the Office of Child Services.

1990 to 1994; and Count III, the subject of the instant appeal, alleged that Terry molested his grandniece, S.B., in 2008.

At trial, the jury heard the Gingerbread House interviews, as well as testimony from law enforcement, DCFS, the Gingerbread House employee who had interviewed S.B., an expert witness who had examined S.B. and found signs of sexual abuse, Terry's daughters A.L. and T.C., S.B. herself, as well as S.B.'s biological parents, Terry's wife, and various other family members. The jury convicted Terry on all three counts, and Terry was sentenced to concurrent 15-year prison terms on the first two counts and a concurrent 50-year prison term on the last. These convictions and sentences were affirmed on direct appeal by the Louisiana Second Circuit Court of Appeal, and the Louisiana Supreme Court denied Terry's writ application. *State v. Terry*, 47,425 (La. App. 2d Cir. 2012); 108 So. 3d 126, *writ denied*, 2012-2759 (La. 6/28/13), 118 So. 3d 1096.

Terry, proceeding *pro se*, sought post-conviction relief in state court and advanced, *inter alia*, a claim that the evidence was insufficient to support his conviction on Count III. The First Judicial District Court of Louisiana dismissed Terry's sufficiency-of-the-evidence claim as repetitive and ultimately denied Terry's petition as to all of his claims. The Louisiana Second Circuit Court of Appeal and Louisiana Supreme Court both denied Terry's resulting petition for supervisory review.

In 2018, still proceeding *pro se*, Terry filed a § 2254 petition raising several claims for relief—including, as relevant here, a claim that the trial evidence was legally insufficient to convict him on Count III. The district court adopted the magistrate judge's recommendation in full, denying Terry's § 2254 petition but granting a Certificate of Appealability as to the sufficiency of the evidence on Count III. Terry timely appealed.

No. 21-30638

Again proceeding *pro se*, Terry filed both an opening and reply brief in the instant appeal. He was then appointed counsel on November 29, 2022, and submitted a supplemental brief.

## II.

Before turning to the evidence presented at trial, we begin by noting the proper legal standards that guide our review. "In a habeas corpus appeal, we review the district court's findings of fact for clear error and its conclusions of law *de novo*, applying the same standards to the state court's decision as did the district court." *Jenkins v. Hall*, 910 F.3d 828, 832 (5th Cir. 2018) (citation omitted).

"The Anti-Terrorism and Effective Death Penalty Act ('AEDPA') governs a federal habeas court's review of a state prisoner's claims that were adjudicated on the merits in state court." *Fields v. Thaler*, 588 F.3d 270, 273 (5th Cir. 2009) (citing 28 U.S.C. § 2254(d)). AEDPA "imposes important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases." *Shoop v. Hill*, 139 S. Ct. 504, 506 (2019) (per curiam). Indeed, under AEDPA, "federal courts cannot grant relief unless the state adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law,'" or it "'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Reeder v. Vannoy*, 978 F.3d 272, 276 (5th Cir. 2020) (quoting 28 U.S.C. § 2254(d)(1)-(2)).[2] In other words, "[t]o satisfy the standards of § 2254(d), a state prisoner must show that the state court's ruling on his claim 'was so

_____

[2] Notably, a state court's determination of a factual issue must be presumed to be correct unless the petitioner rebuts the presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

4

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Miller v. Thaler*, 714 F.3d 897, 901 (5th Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

This standard is intentionally "difficult to meet," because it reflects the view that habeas corpus does not serve as a "substitute for ordinary error correction through appeal" but rather "guard[s] against extreme malfunctions in the state criminal justice systems." *Harrington*, 562 U.S. at 102-03 (citation omitted); *see also Boyer v. Vannoy*, 863 F.3d 428, 440-41 (5th Cir. 2017).

Here, Terry seeks postconviction habeas relief on sufficiency-of-the-evidence grounds, which is governed by the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *West v. Johnson*, 92 F.3d 1385, 1393 (5th Cir. 1996). Per *Jackson*, it is not the reviewing court's role to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt," but to ask, instead, "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19 (internal quotations and citations omitted). Relief "[u]nder section 2254 . . . 'on a claim of insufficient evidence is appropriate only if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'" *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (quoting *West*, 92 F.3d at 1393).

"This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. In reviewing the record, courts do not "reevaluate the weight of the evidence or . . . the credibility of the witnesses," *United States v. Fields*,

977 F.3d 358, 363 (5th Cir. 2020) (quoting *United States v. Bowens*, 907 F.3d 347, 350 (5th Cir. 2018)) (alteration in original). Nor is it "necessary that the evidence exclude every reasonable hypothesis of innocence; the jury is free to choose among reasonable constructions of the evidence." *Id.* (quoting *United States v. Pennington*, 20 F.3d 593, 597 (5th Cir. 1994)).

Thus, a habeas claim brought under *Jackson* is subject to a "twice-deferential" standard. *Parker v. Matthews*, 567 U.S. 37, 43 (2012); *see also Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam) ("We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."). The first layer of deference is to the jury's determinations at trial. "[O]n direct appeal, 'it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.'" *Coleman*, 566 U.S. at 651 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)). As to this first stage, reviewing courts apply the *Jackson* standard and "may set aside the jury's verdict on the ground of insufficient evidence *only if no rational trier of fact could have agreed with the jury*." *Cavazos*, 565 U.S. at 2 (emphasis added).

The second layer of deference is to the state court's decision as to the jury's determinations. "[A] state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the 'decision was objectively unreasonable.'" *Parker*, 567 U.S. at 43 (citation omitted); *see also Coleman*, 566 U.S. at 651 ("And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.'" (quoting *Cavazos*, 565 U.S. at 2)).

## III.

Terry advances three arguments challenging his conviction for Count III. First, in both his *pro se* and counseled briefing, he argues no rational jury

No. 21-30638

could find that he was the individual who molested S.B. Second, and in the alternative, he argues in both his *pro se* and counseled briefing that no rational jury could find that the described acts were "lewd or lascivious" as required under the law. Third, he argues that the evidence failed to establish that any molestation occurred in Caddo Parish, Louisiana, as opposed to Mississippi. Notably, this last argument was neither raised nor addressed by counsel in the supplemental briefing.

A.

Terry maintains that the state court[3] unreasonably applied *Jackson* in determining that the evidence presented at trial was sufficient to support his conviction, because Terry was not sufficiently identified by S.B. as the person who touched her. In so arguing, Terry's counsel emphasizes two primary points in the supplemental brief: first, that "the *only* connection in the record to the Petitioner-Appellant by S.B. is her use of the nickname 'Terry Terry Terry,'" which S.B. used to refer to several other people, including her biological father, Jonathan; and second, repeated testimony at trial where S.B. says either that "Jonathan" (her biological father) or her "daddy" touched her. Such evidence, Terry argues, renders unreasonable the state court's conclusions that S.B. "stated that Defendant was the person who did those acts alleged by her" or that S.B. "provided sufficient information to show that she was indeed referring to Defendant and not her biological father" as the perpetrator.

---

[3] As the Louisiana Second Circuit Court of Appeal (henceforth, "the state court") was the last court to issue a reasoned decision on Terry's sufficiency claim, this is the relevant state court decision to be reviewed. *See Reeder*, 978 F.3d at 276 n.5 (explaining that "[t]his analysis is applied to the 'last related state-court decision' that provides a 'relevant rationale'" (quoting *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018))).

No. 21-30638

It is true that S.B., both in her Gingerbread House interviews (at four years old) and at trial (at six years old), gave inconsistent accounts as to who "Terry Terry Terry" was—confirming, at various points, that "Terry Terry Terry" referred to M.B. (S.B.'s biological mother), J.B. (S.B.'s biological father), her two younger brothers, and her daddy's brother (Terry). The inconsistent reference does, admittedly, make some of the testimony confusing. That alone, however, is not dispositive. The uncertainty only begins the inquiry, as the jury was entitled to look to contextual clues as to the identity of "Terry Terry Terry." It is here that Terry overlooks several pieces of identifying and corroborating evidence that would not be unreasonable for the jury—or the trial court—to have considered in reaching its determinations.

First, circumstantial evidence regarding S.B.'s living arrangements could reasonably have furnished support for the jury's conclusion that Terry was the perpetrator. Initially, S.B.'s biological parents sent all three of their biological children (S.B. and her two brothers, N.B. and Justin[4]) to live with Terry.[5] At some point, however, N.B. moved back in with M.B., leaving only

---

[4] The boy's first name (Justin) is used in lieu of his initials (J.B.) in order to avoid confusion with S.B.'s biological father Jonathan, who bears the same initials, and will be more extensively referenced as "J.B." throughout this opinion.

[5] Testimony about the reasons for this arrangement conflicted. S.B.'s biological mother, M.B., testified that she had sent the kids to live with Terry because she was having a nervous breakdown, felt like she had no help with the children, and needed time to get on her feet. J.B., S.B.'s biological father, however, testified that the kids stayed with Terry because of financial reasons, namely, that he was not working, and denied that M.B. had experienced a nervous breakdown. Terry's then-wife, Jennifer Terry, testified that J.B. and M.B. had been kicked out of Terry's mother's house and were struggling with housing, and that she had offered to take in both M.B. and the children. According to Jennifer Terry, M.B. chose to stay with J.B. but asked if Terry and Jennifer Terry could take the children without her. Terry similarly suggested that they took in the children because J.B. and M.B. did not have a place to live. Regardless of the reason, the facts show that S.B. was three, almost four, when she went to live with Terry. At first, for ten months to a year, they

the two youngest in Terry's care. At the time the Gingerbread House interview took place, S.B. had been living with Terry, Jennifer Terry (Terry's wife), and Justin for almost two years, since 2006. In her first Gingerbread House interview, S.B. stated that she lived with her "momma, daddy, and Justin." She also stated that her "daddy," named "Terry Terry Terry," is the one who touched her. In light of this evidence, the jury could reasonably have found that the "daddy" with whom S.B. lived and who touched her was, in fact, Terry—a conclusion bolstered both by M.B.'s admission that S.B. called Terry "dad" and by testimony from Terry's sister that S.B. called Terry and Jennifer Terry "mom" and "dad."

Likewise, the timing elements in S.B.'s description of the touching— that it occurred in her bedroom while she was in bed, and occurred more than once (first happening when she was three and again when she was four)— also support the conclusion that Terry was the perpetrator, as during that timeframe, S.B. was not living with her biological father J.B., but was in Terry's custody.

Moreover, Terry's arguments that the record confirms that "Terry Terry Terry" unequivocally referred to J.B. is belied by the actual testimony. It is true that, when asked at trial to whom she had meant to refer when she said during her Gingerbread House interview that "Terry Terry Terry was [her] daddy," S.B. responded "Jonathan" [J.B.] and that she similarly responded "[y]es, sir," when asked whether she meant "Jonathan" when she said that "Terry Terry Terry did things to [her]." But in the same testimony, S.B. also stated that Terry Terry Terry was her "daddy's brother."[6] Terry

---

resided in a trailer in Shreveport, Louisiana, before moving to Mississippi, where they lived for several months before Terry's arrest on the present charges.

[6] As to inconsistencies as to whom S.B. was referring when she named her "daddy," the jury could have reasonably found that S.B. referred to Terry as her "daddy"

was therefore at least one of the individuals who S.B. referred to by the moniker "Terry Terry Terry." Indeed, the moniker would seem to apply most naturally to Petitioner, whose first *and* last name is Terry.

These inconsistencies in S.B.'s trial testimony as to Terry Terry Terry's identity are actually similar to the inconsistencies upon which Terry attacks S.B.'s Gingerbread House interview statements; as a result, neither set of statements, in isolation, furnishes conclusive identification.[7] But again, the jury was entitled to consider S.B.'s testimony in context. At the Gingerbread House, S.B. was a four-year-old who was allowed to play with markers while answering questions. At trial, she was a six-year-old being asked to recount, in the formal setting of the courtroom, events that had happened at least two years earlier. Whether due to the temporal gap or S.B.'s relative comfort in the two settings, the jury could have reasonably found that the contemporaneous Gingerbread House statements were more accurate. Further, by the time S.B. testified at trial, she had been living in the custody of J.B. and M.B., her biological parents. The jury, who had the benefit of live testimony in which they could evaluate the tenor, tone, and cadence of each witness's response, could also have reasonably believed that the parents, who expressed that they did not believe S.B.'s allegations and who wanted Terry to avoid conviction, had influenced S.B.'s trial testimony.[8] These are all

---

during the time when she lived with him and that, by the time of trial, at which point she had been living with M.B. and J.B., she referred to J.B. as her "daddy."

[7] Although Terry implies in his *pro se* briefing that these inconsistencies render S.B.'s testimony internally contradictory and conflicting, S.B. was a young child both in the Gingerbread House interviews and at trial. The fact that her testimony was at times unclear is thus best understood (and could have reasonably been understood by the jury) to be a function of her age, not her truthfulness.

[8] Although M.B. denied this, there was at least some suggestion that Terry was giving them financial support while the children lived with him. M.B. also testified that they had discussed letting Terry adopt the children.

No. 21-30638

possibilities that preclude the conclusion that *no rational trier of fact* could have agreed with the conviction. And in any event, ultimately, "discrepancies in witness testimony go to the weight and credibility of the evidence, which [this court] do[es] not review." *United States v. Bowen*, 818 F.3d 179, 188 (5th Cir. 2016).[9]

Second, Terry fails to address other incriminating evidence introduced at trial. For instance, Dr. Ann Springer, a pediatrician at LSU Health Sciences Center and the medical director for the CARA Center,[10] testified as an expert in child abuse medicine. Dr. Springer examined S.B. for signs of sexual abuse on June 19, 2008. She stated that before the examination, she had been informed that S.B. had disclosed in an interview that her caretaker, her great uncle, had "squeeze[d] and pinche[d] her behind and vagina." Dr. Springer's examination revealed chronic redness irritation of the vulva and labia majora, chronic yeast infection, and tissue separation of the hymen consistent with sexual abuse and digital penetration. Based on these findings, Dr. Springer's report indicated physical neglect and sexual abuse.

Critically, Terry does not meaningfully address Dr. Singer's testimony. Though he claims two additional doctors refuted Dr. Springer's opinion (Dr. Lococo and Dr. Taylor), that evidence only came in through the testimony of S.B.'s biological parents M.B. and J.B. The defense never

---

[9] The state court's statement that S.B. "stated that Defendant was the person who did those acts alleged by her" could be read to imply that S.B. unequivocally identified Terry at trial, which is not supported by the record. However, this statement would be accurate if, rather than read in isolation, it is read to incorporate the preceding analysis—in other words, if it incorporates the various context clues to reach the conclusion that S.B., when she said that "Terry Terry Terry" and her "daddy" had touched her, was referring to Terry.

[10] The CARA Center provides diagnosis and support for victims and suspected victims of child abuse.

introduced direct testimony from these doctors, nor was Dr. Springer ever asked to share her findings with another medical professional. Faced with such evidence, it would not be unreasonable for the jury to find Dr. Springer's testimony credible.[11]

Third, there is testimony from other professionals involved in the investigation that indicated that Terry's behavior was "surprising" and potentially suspicious. JaLes Washington, a child protection investigator for Caddo Parish who was assigned to S.B.'s case, testified that at the beginning of the investigation, she called Terry to notify him that DCFS needed to see the children due to an allegation of abuse or neglect, but she did not provide any details as to the allegation on that initial call. She did not specify, for instance, whether DCFS was looking into sexual abuse as compared to physical neglect. Washington also testified that Terry would have no reason to believe that he, as opposed to S.B.'s parents, was the subject of the investigation. Shortly after this phone call with Washington, however, Terry called her and left a voicemail in which Terry was "upset" and stated that he had not molested anyone. Washington testified that the voicemail was surprising given that Terry was denying molesting anyone when that allegation had not yet been brought before him. Detective Dorothy Brooks of the Caddo Parish Sheriff's Office corroborated this testimony when she reiterated that Terry was not told any specifics about the allegations during his initial contacts with DCFS.

The defense did elicit testimony from several witnesses, such as S.B.'s biological parents and Terry's then-wife, Jennifer Terry, who testified that

---

[11] Although Terry claims that this testimony does not help confirm identity, it could reasonably be viewed by a jury to corroborate the conclusion that S.B. had been molested (which some witnesses disputed) during a time when she was under Terry's care and custody.

they had seen nothing to indicate any abuse and they did not believe the allegations. The mere existence of such testimony, however, is insufficient to clear the demanding hurdle to warrant habeas relief. Terry's challenge is tantamount to a request to re-weigh the evidence and make inferences in his favor, but that is not our role. Particularly when viewed in the light most favorable to the prosecution, the evidence described above would likely suffice for a conviction even under a direct application of *Jackson*, let alone under the twice deferential standard required here. It simply cannot be said that the state court was objectively unreasonable in its determination that the jury had sufficient evidence to convict Terry on Count III.

### B.

In the alternative, Terry contends that no rational jury could have found that, even assuming he touched S.B., he engaged in a "lewd or lascivious act." Under Louisiana law, "[a] 'lewd or lascivious act,' for purposes of molestation of a juvenile, is one which tends to excite lust and to deprave morals with respect to sexual relations and which is obscene, indecent, and related to sexual impurity or incontinence carried on in wanton manner." *State v. Redfearn*, 44,709, p. 11 (La. App. 2d Cir. 9/23/09); 22 So. 3d 1078, 1087, *writ denied*, 2009-2206 (La. 4/9/10); 31 So. 3d 381; *see also* LA. REV. STAT. § 14:81.2 (2008). Repeating an argument that he had previously raised in state court, Terry claims in both the *pro se* and counseled briefing that the "described painless squeezing or pinching [of] S.B.'s butt and vagina" does not satisfy Louisiana's definition for "lewd or lascivious."

Though it did not address this argument directly, the state court did reference both the expert's testimony finding that S.B. had been sexually abused and S.B.'s own testimony about what had been done to her and where, which it found "sufficient to prove the elements of the offense."

No. 21-30638

We agree. The evidence was clearly sufficient for a rational jury to find that the described acts were "lewd and lascivious"—and Terry's alternative explanations do not disturb this conclusion. Terry's counsel's argument, for instance, that it can be normal for adults to "squeeze and pinch" a child's behind under their clothes, flies in the face of common sense. Terry's provided examples of when such behavior might occur—such as when a child needs help with the restroom—are far afield of the facts before us. As the district court correctly noted in rejecting this argument, "[t]here [is] certainly no innocent explanation for such actions."

Equally unavailing is counsel's suggestion that acts must be painful in order to be obscene or indecent. The law does not require that victims must feel pain in order for molestation to qualify as lewd and lascivious, and Terry neither cites case law nor identifies statutory language in support of his argument. Nor is there caselaw support for why evidence that he squeezed and pinched a child's genitals, at night, while that child was in bed, would be insufficient for the jury to find that his conduct was "lewd and lascivious." A rational jury certainly could have found that the described acts were "obscene, indecent, and related to sexual impurity," *see Redfearn*, 44,709 at p. 11; 22 So. 3d at 1087, and thus the state court was not objectively unreasonable in rejecting this claim.

## C.

Finally, Terry contends—in his *pro se* briefing only—that the evidence was insufficient to establish that any molestation occurred in Louisiana as opposed to Mississippi.

As a threshold issue, the place of the crime is not an element of the offense of molestation of a juvenile under Louisiana law. *See State v. Rideout*, 42,689, p. 4 (La. App. 2 Cir. 10/31/07); 968 So. 2d 1210, 1212, *writ denied*, 2008-2745 (La. 9/25/09); 18 So. 3d 87. Instead, this issue is one of venue

14

rather than sufficiency. *Id.* ("[I]f the defendant feels that he is being charged for an offense that occurred in another parish, or that the State cannot prove the venue of the alleged crime, he must raise the issue before trial by a motion to quash, and it must be decided by the court before trial."). Accordingly, this argument must be properly addressed through a motion to quash and not a sufficiency challenge.[12] As Terry has not done so, he fails to preserve this argument.

Even were that not so, the record reflects that a jury could have reasonably found that some or all of the criminal acts against S.B. occurred in Caddo Parish, Louisiana, based on S.B.'s indications in her second Gingerbread House interview that Terry had touched her in a trailer both in Mississippi and "here" (which the jury could reasonably have taken to be Caddo Parish).[13]

## IV.

We do not find that the state court was objectively unreasonable in rejecting Terry's claim that there was insufficient evidence to convict him on Count III. Accordingly, we AFFIRM the district court's denial of his § 2254 petition.

_____

[12] Terry also failed to preserve this argument, as he did not file a motion to quash or otherwise raise a pretrial challenge to the venue.

[13] Again, it was undisputed that S.B. had spent the first year or so living with Terry in Louisiana; S.B. was three, almost four, when she went to live with Terry; and S.B. indicated that she was "three" when the molestation began.