**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Plasco G. MOORE, Defendant-Appellant.**

**No. 28765**

**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

May 28, 1970.

Rehearing Denied Aug. 6, 1970.

Lester L. May, Kenneth A. Herridge, Dallas, Tex., for defendant-appellant.

Eldon B. Mahon, U. S. Atty., Dallas, Tex., Charles D. Cabaniss, Asst. U. S. Atty., for plaintiff-appellee.

Before THORNBERRY, CLARK and INGRAHAM, Circuit Judges.

CLARK, Circuit Judge.

On stipulated facts in a trial before the court without a jury, Plasco G. Moore was convicted on each of 10 counts charging wilful embezzlement and conversion of funds of an employee pension benefit plan to his own use and to the use of the Retail Furniture Association of Texas, Inc. (RFAT). His contentions that the stipulation failed to prove the elements of the crime, particularly a wilful or knowing criminal act, and that the district court erred in considering the defendant's consciousness of guilt in connection with his sentencing, are not well taken. We affirm.[1]

Defendant was the Executive Secretary of RFAT, a Texas corporation, which had established an employee-welfare benefit plan which was subject to the provisions of the Welfare and Pension Plans Disclosure Act.[2] The benefit plan was in the form of an insurance trust which was charged with the duty of providing group, life, accident and hospital insurance for the owners, partners and employees of member firms of

1. Pursuant to Rule 18 of the Rules of this Court, we have concluded on the merits that this case is of such character as not to justify oral argument and have directed the clerk to place the case on the Summary Calendar and to notify the parties in writing. See Murphy v. Houma Well Service, 409 F.2d 804 (5th Cir. 1969), Part I; and Huth v. Southern Pacific Company, 417 F.2d 526 (5th Cir. 1969), Part I.

2. 29 U.S.C. § 301 et seq. (1965)

RFAT. On the ten separate occasions which formed the basis for the separate counts against him, defendant, without authorization of the trustees of the insurance trust fund, instructed an employee under his control who had charge of paying monthly premiums from the insurance fund account, to pay more than was then due to the insurance company carrying the coverage for the trust. As a consequence of this deliberate overpayment the insurance company carrying the coverage issued its check refunding the excess amount. These checks were payable directly to RFAT rather than the insurance trust. The drafts covering these repayments showed on their face either "Refund of unearned premium" or "Refund of premium overpaid." Defendant negotiated each of these checks and applied these refunded excess funds to reduce account balances carried in his personal name at the 21 Turtle Club, Kings Club, Adolphus Hotel and Sigel Liquor Store in Dallas, Texas, and the Continental Houston Hotel in Houston, Texas. In addition to credits on these accounts, a total cash sum in excess of $3,282.18 was obtained by defendant through this same procedure. No part of the refunds was returned to the insurance fund.

Even larger amounts than were represented by these repayments of deliberate overpayments were paid over to RFAT by the trustees of the insurance fund for the purpose of defraying the expenses of operating and servicing the insurance program, a function which was handled by RFAT for the insurance trust. Only part of these payments was needed to meet the expense of operating and servicing the insurance service. The other part of these funds was used by RFAT to pay similar club and whiskey store accounts and to provide defendant with cash funds.

In connection with his sentencing, defendant advised the court that all "refund" funds he was charged to have embezzled or converted were used in carrying on the legislative lobbying activities of RFAT. He further stated that all payments of insurance fund monies made to RFAT, whether received from the insurance companies in the form of refunds or received directly from the trustees for the purpose of defraying expenses, were payments which were not needed to meet insurance premium costs and were funds which after payment of actual operating and servicing expenses, would have eventually become the property of RFAT anyway and would have been used to defray these same lobbying expenses.

All counts of the entitlement against defendant charged violations of 18 U.S. C.A. § 664 (1966), which provides in pertinent part:

"Any person who embezzles, steals, or unlawfully and wilfully abstracts or converts to his own use or to the use of another, any of the monies, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined not more than $10,000, or imprisoned not more than five years, or both."

The defendant's conviction on all ten counts resulted in concurrent sentences of 13 months on each count.

At the sentencing proceedings, held one week after the court's determination of guilt, defendant made a lengthy statement concerning his past life which he described as industrious, productive and free of any significant criminal activity. At this point the following exchange occurred between the defendant and the district judge:

"THE DEFENDANT MOORE:

* * * In relation to the case here today, I did not do a single dishonest act. The use of the funds for the Association, as they were used, I did not think was illegal. Certainly none of it accrued to me personally. (30). It was the responsibility of somebody to transfer funds, Your Honor, from that in the temporary custody of a Trustees' insurance bank account to the Association.

THE COURT:

You must have known that the funds were not to be used for the purpose for which you spent them? Most of the funds were used to pay club bills?

THE DEFENDANT MOORE:

Yes.

THE COURT:

Those bills had been incurred by reason of your lobbying, and certainly you did not do anything for the fund in connection with the money that was expended.

THE DEFENDANT MOORE:

Yes, Your Honor. Some $64,000 during this period was transferred, and much of that was used to pay off things as club bills.

The Board of Directors, Your Honor, made such transfer without seeking authority from the Insurance Board of Trustees.

THE COURT:

I would like it much better if you would take some blame in this matter instead of saying that you did nothing wrong.

THE DEFENDANT MOORE:

Well, may I change the phrase then to—I did not think I did anything illegal, Your Honor.

THE COURT:

Did you think you did something wrong?

(31) THE DEFENDANT MOORE:

I think it's wrong when you do not follow correct bookkeeping procedures.

THE COURT:

And when you spend money for purposes for which it wasn't intended?

THE DEFENDANT MOORE:

Well, the money which would eventually have been transferred to the Association, I mean, could have been for any purpose, once it got into the general account."

After additional remarks from the defendant and his counsel, the court stated:

"Mr. Moore, will you stand up, please.

You have had many admirable things in connection (34) with your life and beginning with the time when you were a child. You made a lot of yourself against many difficulties—in the face of many difficulties, so I admire you for those.

The thing, though, that concerns me is that you see nothing wrong with what you have done. Disregarding the fact that it was a violation of a Federal law, you pass that by. I still think that you should realize that to spend money for the purpose for which you spent it, quite contrary to the purposes of the fund, that you were doing something wrong, whether you considered it illegal or not, and the fact that you do not think you did anything wrong really concerns me more than anything else.

Now, an offense such as this in my opinion, the purpose of sentencing is not only to rehabilitate, and to punish. I think you've been punished. I doubt that you need rehabilitation, though I think you should have some time to consider whether what you did was morally wrong, but the purpose of sentencing in a case like this is to deter others who have in their hands money that belongs to somebody else and use it for their own purposes. So, I do feel that you should have an institutional sentence."

■■ This is a court of review. Its function is not to try the defendant de novo. Campbell v. United States, 291 F.2d 401 (5th Cir. 1961). We apply here the same test to determine the sufficiency of the stipulated facts as would be applied if we were reviewing the relevant and admissible evidence upon the action of the trial court in refusing to direct a judgment of acquittal. Cf. De Luna v. United States, 228 F.2d 114 (5th Cir. 1956). That test expressed in the terms of this case, is whether the judge could accept the stipulated facts,

considered in the light most favorable to the government, as adequate and sufficient to support the conclusion that the defendant was guilty beyond a reasonable doubt. Henderson v. United States, 425 F.2d 134 (5th Cir. 1970); United States v. Bearden, 423 F.2d 805 (5th Cir. 1970); United States v. Preston, 420 F.2d 60 (5th Cir. 1970).

■ In applying this test to the case at bar we are bound to say that the facts which were stipulated were amply sufficient to enable the court as a trier of fact to find the defendant guilty of every essential element of the crime defined by statute. The insurance fund was a separate entity from RFAT and was expressly stipulated to be a plan covered by the Welfare and Pension Plans Disclosure Act. The stipulation established that funds belonging to the plan were knowingly and intentionally, not inadvertently or mistakenly, diverted through a transparent ruse from the account of the plan to the account of the defendant.

There is no need for this court to wrestle with the difficult question of whether this statute, as a part of an over-all scheme of remedial legislation, requires proof of an evil or criminal intent or whether it merely requires a showing of facts which violate the provisions of the statute.[3] The law assumes every man to intend the natural consequences of his rational acts. Moorman v. United States, 389 F.2d 27 (5th Cir. 1968). It was for the trier of fact to conclude whether the mental element of a wrongful purpose was disclosed by the stipulated facts. Whether we apply the strict or more relaxed legal standard to the requirements of the statute below is immaterial to the outcome of this appeal. If the statute required no criminal intent the facts set out in the stipulation in and of themselves proved defendant guilty. If mens rea was legally required the evidence was more than sufficient to warrant the court in concluding that such an intent was present, and thus under the legal test we are to apply in this court, the trial court's determination of guilt may not be disturbed.

■ The defendant's objection to the colloquy between himself and the court at the time of sentencing raises the issue of this court's function in reviewing or supervising district court sentencing procedures: Normally, sentences to be assessed, so long as they are within the statutory limits, are committed to the sound discretion of the trial judge and will not be disturbed on appeal in the absence of a clear abuse of that discretion. See, e. g., Castle v. United States, 399 F.2d 642 (5th Cir. 1968).

Here the ten counts on which defendant was convicted could have resulted in consecutive sentences totaling 50 years plus fines totaling 100,000 dollars. Against this possible penalty the court's imposition of 13-month concurrent sentences are, to say the least, mild. Certainly the length of the sentence does not demonstrate any pique or personal animosity on the part of the trial judge. Rather, the sentencing proceedings read as a whole indicate that the court was motivated only by a proper concern for the due administration of justice. Since the sentence imposed was a mere fraction of that authorized, we view this case differently from the case before this court in Thomas v. United States, 368 F.2d 941 (5th Cir. 1966); which called into play this court's supervisory power over sentencing procedures. See also Scott v. United States, 419 F.2d 264 (D.C.Cir. 1969); contra, Williams v. United States, 273 F.2d 469 (10th Cir. 1959).

Regardless of the trial court's motivation, such exchanges between the court and a defendant are fraught with the

---

3. See Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), interpreting a very similar statute, 18 U.S.C.A. § 641; McBride v. United States, 225 F.2d 249 (5th Cir. 1955); and Roe v. United States, 287 F.2d 435 (5th Cir. 1961).

latent dangers which were pointed out in *Thomas*. For all of the reasons pointed out in that opinion, such remarks or requests to a defendant during sentencing should be avoided. However, if the trial court did in fact penalize defendant in any way for his refusal to confess guilt at sentencing, we know that court will act to correct the sentence imposed under the provisions of Rule 35, Fed.R. Crim.P. We deem it neither necessary nor appropriate to exercise this court's supervisory power in this case.

Affirmed.