[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13543

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

KYLE MELKONIAN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:21-cr-20414-DPG-1

_____

Before LAGOA, BRASHER, and ABUDU, Circuit Judges.

PER CURIAM:

Kyle Melkonian appeals his conviction and sentence for theft of government funds, in violation of paragraph 2 of 18 U.S.C. § 641. For the reasons set forth below, we affirm.

## I.    FACTUAL    BACKGROUND    &    PROCEDURAL HISTORY

In 2021, a federal grand jury indicted Melkonian on one count of theft of government funds, charging him with "knowingly and willfully" receiving, concealing, and retaining "with the intent to convert to his own use and gain" money belonging to the United States Social Security Administration ("SSA"), "knowing the money to have been stolen, purloined and converted." The indictment contained a forfeiture provision, explaining that Melkonian must forfeit his real and personal property that constituted or was derived from the proceeds of the charged crime upon conviction.

Melkonian pled not guilty and waived his right to a trial by jury. He proceeded to a bench trial on the following stipulated facts. Melkonian's father ("P.M.") lawfully received retirement benefits from the SSA. P.M. lawfully received those benefits until his death on October 15, 2006. P.M.'s entitlement to SSA benefits ceased in the month of his death, but Melkonian, who lived with P.M. at the time he died, did not inform the SSA of P.M.'s passing. Thus, the SSA continued to pay the benefits after P.M. died. Melkonian had no entitlement to P.M.'s retirement benefits.

The SSA deposited P.M.'s SSA benefits into an account at American Bank (the "American Bank account"). Melkonian knew of these deposits, that the SSA made them, and that he had no lawful authority to access the account or to receive, retain, or use any of the money in it. Melkonian "knowingly and willfully" concealed P.M.'s death so he could continue to receive SSA benefits to use for his own purposes, such as paying his bills and making personal purchases.

P.M. also had a bank account at J.P. Morgan Chase Bank (the "Chase account"), which Melkonian had no legal authority to access. After P.M.'s death, Melkonian had a recurring check issued every three months in P.M.'s name from the American Bank account which automatically deposited into the Chase account. Melkonian would then withdraw cash from the Chase account for his own use.

After P.M.'s death, between 2011 to 2020, Melkonian received several letters addressed to P.M. from the SSA concerning P.M.'s benefits. One of the letters stated that a SSA employee would call to speak with P.M. about the correct payment of the benefits. When the employee called, Melkonian answered the phone, claimed to be P.M., provided P.M.'s personal information, and claimed to be living with his son "Kyle." Melkonian did this "knowingly and willfully" in an effort to "intentionally conceal" P.M.'s death so he could continue to receive the SSA benefits. After the call, Melkonian received follow-up letters asking P.M. to appear at the local SSA field office, but Melkonian never responded or

appeared.  SSA employees also visited Melkonian's residence to speak with P.M., but Melkonian told them P.M. could not speak with them and instructed them to leave the property.

Ultimately, the SSA learned of P.M.'s death in early 2020 and ceased making payments.  By then, the SSA had deposited a total of $286,944 in benefits into P.M.'s accounts.  In April 2020, the government seized the remaining $2,784.03 in the American Bank account.

The government presented no additional evidence and submitted the case on the above stipulations.  Melkonian moved for a judgment of acquittal, explaining that he did not dispute the basic facts of the case, but he did believe the basic facts did not sufficiently qualify as a violation of paragraph 2 of § 641.  After additional arguments, the district court denied the motion.  Melkonian then presented no additional evidence and renewed his motion for an acquittal, requesting an opportunity to brief his arguments for the court.  The district court granted Melkonian's request for briefing and issued a continuance.

In his brief, fashioned as a motion for reconsideration of the district court's denial of his motion for a judgment of acquittal, Melkonian argued that the stipulated facts failed to show that he knew the money was stolen separately from the facts showing he was the actual thief, nor did the evidence sufficiently establish that the SSA deposits were even stolen.  The government opposed Melkonian's arguments.

At a hearing, following additional arguments, the district court found Melkonian guilty of theft of government property and denied his renewed motion for acquittal. The court found the evidence sufficiently established that Melkonian knew that the money was stolen or converted due to the number of payments involved and the active steps he took to conceal P.M.'s death.

Before sentencing, a probation officer prepared Melkonian's presentence investigation report ("PSI"), which recommended denying him the acceptance of responsibility reduction, to which Melkonian objected. The PSI also set Melkonian's offense level at 18 and assigned him to criminal history category I, meaning his guideline imprisonment range was 27 to 33 months. The PSI noted the maximum fine Melkonian could face was $573,888, pursuant to 18 U.S.C. § 2571(d), and that the guideline fine range was between $10,000 to $100,000, pursuant to U.S.S.G. § 5E1.2(c)(4).

Meanwhile, Melkonian submitted a *pro se* letter to the court reiterating that he did not believe a "theft" occurred and explaining that "if" taxpayers had been harmed, he "would be ashamed and genuinely remorseful." He also stated that "if" he had been "greedy," he "would also feel very sorry and low even for taking money that [he] viewed as akin to non-transparent intellectual property that was not owned by the government."

The government moved for forfeiture in the amount of $284,159.97, the difference between the total paid after P.M.'s death and the amount recovered from the American Bank account. The government requested substitute forfeiture of all real estate owned

by Melkonian, including his residence, explaining that it had not been able to locate all directly forfeitable property. Melkonian opposed the forfeiture, arguing that it would violate the Excessive Fines Clause of the Eighth Amendment.

At the sentencing hearing, Melkonian argued that he was entitled to a reduction for acceptance of responsibility. The court overruled Melkonian's objection, citing to Melkonian's letter to the court.

Then, after considering the statutory sentencing factors, the parties' arguments, and the PSI's recommendation, the court sentenced Melkonian to fourteen months' imprisonment and three years' supervised release, declined to impose a fine, and ordered him to pay $284,159.97 in restitution. The court then granted the government's motion for forfeiture, noting that the impact on Melkonian could be determined once his house was sold. Melkonian's appeal followed.

## II.    STANDARD OF REVIEW

We review *de novo* whether evidence sufficiently supports a conviction. *United States v. Isnadin*, 742 F.3d 1278, 1303 (11th Cir. 2014). "A determination of whether a defendant accepted responsibility for his crimes is reviewed for clear error." *United States v. Williams*, 627 F.3d 839, 844 (11th Cir. 2010). Finally, we review *de novo* whether a forfeiture order is constitutionally excessive. *United States v. Browne*, 505 F.3d 1229, 1278 (11th Cir. 2007).

### III.    DISCUSSION

#### A.  *Sufficient Evidence Supports Melkonian's Conviction.*

On appeal, Melkonian continues to argue that insufficient evidence supports his conviction because the stipulated facts never established that he knew the funds in his father's account were stolen upon deposit.  He alternatively argues that, even if the money was stolen, he could not receive stolen property from himself.

Evidence sufficiently supports a conviction "if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt."  *Isnadin*, 742 F.3d at 1303 (quoting *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009)).  In cases involving bench trials on stipulated facts, the test is "whether the judge could accept the stipulated facts, considered in the light most favorable to the government, as adequate and sufficient to support the conclusion that the defendant was guilty beyond a reasonable doubt."  *United States v. Moore*, 427 F.2d 38, 41-42 (5th Cir. 1970).

Paragraph 2 of § 641 prohibits the receiving, concealing, or retaining of government property "with intent to convert it to his use or gain, knowing it to have been" stolen or converted.  18 U.S.C. § 641.  To convict a defendant for theft of government property under paragraph 2, the government must establish three elements: (1) the money referenced in the indictment belonged to the United States or a United States agency; (2) the defendant appropriated the money to his own use; and (3) the defendant did so knowingly with the intent to deprive the government.  *United States v. McRee*, 7 F.3d 976, 982 (11th Cir. 1993) (*en banc*); *see also United States v. Rodgers*,

732 F. App'x 849, 851 (11th Cir. 2018) (unpublished) (relying on *McRee* and outlining the three elements needed to support a prosecution brought under paragraph 2 of § 641).

Generally, a defendant cannot be convicted under § 641 for both stealing government property and receiving the same property. *Milanovich v. United States*, 365 U.S. 551, 554-55 (1961). However, *Milanovich* does not stand for the principle "that paragraph two of section 641 is uniformly inapplicable to the person who stole the Government property in question." *United States v. Minchew*, 417 F.2d 218, 219 (5th Cir. 1969). Thus, the government can charge a defendant for receiving or retaining stolen government property even if the defendant was the one who originally stole the government property, just so long as the defendant is not then convicted and punished for both offenses. *Id.* at 219-20.

Here, the stipulated facts considered in a light most favorable to the government are sufficient to affirm Melkonian's conviction for violating paragraph 2 of § 641. *Moore*, 427 F.2d at 41-42. The stipulated facts establish that Melkonian purposefully concealed his father's death from the SSA for 13 years, which caused the SSA to continue sending funds to P.M.'s American Bank account. Melkonian knew the SSA improperly made these deposits because he admittedly understood that the deposits should have ceased upon his father's passing. Instead of informing the SSA of P.M.'s death, Melkonian, knowingly and willfully, understanding he had no lawful authority to do so, accessed his father's bank accounts and used money he was not entitled to, to pay his bills and

make personal purchases. Thus, based on the stipulated facts, the evidence establishes that Melkonian knew the improperly deposited funds, induced by his continued wrongdoing, were stolen from the government upon deposit into P.M.'s American Bank account.

Moreover, even if the initial deposits into the American Bank account would not put Melkonian on notice that the funds were stolen, his subsequent post-deposit activity surely did. Melkonian admittedly understood that the initial deposits into the American Bank account were not intended for him and that his father was not entitled to the payments due to his passing. Nevertheless, Melkonian knowingly and willfully accessed his father's Chase account to set up recurring payments from the American Bank account. At the very least, the transfer of funds from the American Bank account to the Chase account, then to Melkonian's possession, establishes that he knew the funds he received and used were stolen. Thus, we affirm on this issue.

> B. *The District Court Did Not Clearly Err in Declining to Decrease Melkonian's Offense Level Because He Did Not Accept Responsibility.*

Melkonian also argues that the district court erred in not giving him a reduction for acceptance of responsibility because he admitted his guilt through the stipulation of facts and only proceeded to trial to preserve arguments related to the application of § 641 to his acts. He contends that the district court should have given more weight to the stipulations than to his letter which, he maintains,

was incoherent and a reflection of his mental illness as opposed to his sense of remorse.

District courts should decrease a defendant's offense level if he "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). This reduction is given to a defendant as a "reward" for expressing remorse for his wrongdoing and who wants to reform his future conduct. *Williams*, 627 F.3d at 844. We will not set aside the district court's determination on this issue unless "the record clearly establishe[s] that a defendant has accepted personal responsibility." *United States v. Amedeo*, 370 F.3d 1305, 1320-21 (11th Cir. 2004).

The Sentencing Guidelines explain that truthfully admitting the offense conduct helps show acceptance of responsibility. U.S.S.G. § 3E1.1(a), comment. (n.1(A)). Furthermore, "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof" except where the defendant goes to trial to preserve an issue that does not relate to factual guilt. *Id.* comment. (n.2).

Additionally, in determining whether a defendant has accepted responsibility, a court may consider, *inter alia*, "the offender's recognition of the wrongfulness of his conduct, his remorse for the harmful consequences of that conduct, and his willingness to turn away from that conduct in the future." *United States v. Scroggins*, 880 F.2d 1204, 1215 (11th Cir. 1989). A wide range of conduct can be considered, even the assertion of constitutional rights, so long as the conduct relates to whether the defendant has

accepted responsibility. *United States v. Smith*, 127 F.3d 987, 989 (11th Cir. 1997) (*en banc*).

Here, the district court did not clearly err in declining to decrease Melkonian's offense level because the record does not clearly establish that he accepted responsibility. *Amedeo*, 370 F.3d at 1320-21. Melkonian's letter to the district court evidenced his lack of actual remorse for the crime he committed. Melkonian disputed the thefts and emphasized that he would have felt remorse "if" he thought he had actually committed a crime. The district court acted within its authority to consider Melkonian's letter, and the record supports the court's decision in finding that Melkonian failed to demonstrate an acceptance of responsibility. Thus, we affirm on this issue.

### C. *The Forfeiture Order is Not Unconstitutional.*

Finally, Melkonian argues that the forfeiture order violates the Eighth Amendment because it is grossly disproportionate in consideration of the maximum guideline fine, the money he used was not used for criminal activities, he was not the primary target of the statute, and his offense was rooted on mere inaction.

Where forfeitures are authorized and the government gives notices of the forfeiture in the defendant's indictment, the district court must order forfeiture as part of the defendant's sentence. *United States v. Hernandez*, 803 F.3d 1341, 1343 (11th Cir. 2015) (holding that the district court erred in denying the government's forfeiture motion in prosecution for a violation of § 641). Theft of government funds, as outlined in § 641, is subject to civil forfeiture

pursuant to 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(D), and 28 U.S.C. § 2461(c). *Id.* Additionally, the government may move for a substitute forfeiture in instances where the defendant does not retain the stolen funds, meaning the government can take a defendant's property that was involved in or is reasonably traceable to the crime to fulfil the forfeiture amount. *United States v. Waked Hatum*, 969 F.3d 1156, 1166 (11th Cir. 2020).

Because a forfeiture in this context is punishment for an offense, the forfeiture is considered a "fine" within the meaning of the Eighth Amendment. *Id.* at 1167 (quoting *United States v. Bajakajian*, 524 U.S. 321, 328 (1998)). Under the Excessive Fines Clause of the Eighth Amendment, a punitive forfeiture is unconstitutional when "it is grossly disproportional to the gravity of a defendant's offense." *Id.* (quoting *Bajakajian*, 524 U.S. at 334)). We consider three main factors to determine if a forfeiture violates the Eighth Amendment: (1) whether the defendant is within the class of persons the criminal statute was principally directed at; (2) the other penalties authorized by Congress or the Sentencing Commission; and (3) the harm the defendant has caused. *Id.*

"If the value of the forfeited property is within the permissible rage of fines under the relevant statute or sentencing guideline, the forfeiture is presumptively constitutional." *Id.* at 1168. In fact, "[w]e have upheld all forfeitures imposed by district courts in amounts up to twice the maximum authorized fine." *United States v. Sperrazza*, 804 F.3d 1113, 1127-28 (11th Cir. 2015) (collecting cases). The statutory maximum fine for a § 641 violation cannot

be more than twice the gross loss. 18 U.S.C. § 3571(d). Additionally, the guideline maximum fine for a defendant with an offense level of 18 is $100,000. U.S.S.G. § 5E1.2(c)(3).

Here, the forfeiture is not unconstitutional. First, Melkonian squarely fits within the class of individuals § 641 is principally directed at—an individual who intentionally concealed his father's death from the SSA to induce the SSA to continue issuing money to P.M.'s account for Melkonian's personal use, knowing he was not the intended beneficiary. Moreover, the forfeiture amount falls well below the statutory maximum fine allowed, meaning it is presumptively constitutional. Finally, Melkonian fraudulently took almost $300,000 from the United States for his own use and actively concealed the fraud, causing great harm. Thus, we affirm on this issue.

## IV.    CONCLUSION

For the reasons set forth herein, we **AFFIRM** Melkonian's conviction and sentence.