# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 29, 2025

Lyle W. Cayce
Clerk

———————

No. 24-40031

———————

United States of America,

*Plaintiff—Appellee*,

*versus*

Fidel Saldana Rodriguez,

*Defendant—Appellant*,

consolidated with

———————

No. 24-40047

———————

United States of America,

*Plaintiff—Appellee*,

*versus*

Noe De Jesus Martinez-Montelongo,

*Defendant—Appellant*.

———————————————————

Appeals from the United States District Court
for the Southern District of Texas
USDC Nos. 5:22-CR-1568-2,

5:22-CR-1568-1

Before SMITH, HIGGINSON, and DOUGLAS, *Circuit Judges*.
STEPHEN A. HIGGINSON, *Circuit Judge*:

These consolidated appeals arise from the seizure by Customs and Border Protection of a tractor-trailer traveling from Mexico into the United States, carrying liquid methamphetamine in concealed compartments in the tractor's fuel tanks. Appellant Noe de Jesus Martinez-Montelongo was driving the tractor-trailer; Appellant Fidel Saldana Rodriguez was the passenger. Following a jury trial, both Appellants were convicted of conspiracy to import and importation of methamphetamine. On appeal, Saldana challenges the sufficiency of the evidence to support his convictions, while Martinez-Montelongo challenges the substantive reasonableness of his sentence. Finding no reversible error, we AFFIRM Saldana's convictions and AFFIRM Martinez-Montelongo's sentence.

I

A

At approximately 5:30 p.m. on the evening of November 28, 2022, Martinez-Montelongo and Saldana arrived at the Columbia Solidarity Bridge Port of Entry in Laredo, Texas, seeking to cross from Mexico into the United States. The two men were traveling in a tractor-trailer, with a white tractor and an empty refrigerator trailer. Martinez-Montelongo was driving, with Saldana sitting in the passenger seat. Martinez-Montelongo presented Customs and Border Protection ("CBP") Officer Gustavo Vila Cruz with his and Saldana's visas and with a manifest stating that the trailer was empty. Vila Cruz noted it was odd that there were two people in the tractor-trailer because, generally, only a single driver is allowed through the Port of Entry when there is an empty trailer. When there are two people driving an empty trailer, CBP typically immediately turns the tractor-trailer away until it

returns with only one driver or first sends the tractor-trailer for an inspection. Here, Vila Cruz sent the tractor-trailer for inspection after seeing that the vehicle was flagged in CBP's TECS screening system for prior suspicious activity.

Initially, the tractor-trailer was referred for x-ray screening, but the x-ray machine was not operational at the time. The tractor-trailer was referred instead to the secondary screening area overseen by CBP Officer Justin Alvarado. Alvarado testified that there was nothing visually irregular about the fuel tanks. However, a canine enforcement officer inspected the vehicle and notified Alvarado that the dog had alerted to the possible presence of narcotics near the driver's side door, underneath the tractor in the location of the fuel tanks. Alvarado looked inside the fuel tanks using a fiber scope and noticed that one diesel tank appeared to have a barrier inside. He then called in a company called Apple Towing to assist with disassembling the truck as necessary to facilitate the officers' inspection.

Apple Towing first removed the side fenders and the straps holding the fuel tanks in place, at which point Alvarado observed two bolts in the fuel tanks that appeared to be non-standard, aftermarket additions. Apple Towing then cut open the tanks, allowing CBP Officer Mauricio Garza to collect a sample from the tanks for field testing. After the field test indicated the presence of methamphetamine, CBP arrested the defendants, and Apple Towing extracted the liquid from the tanks, filling twenty-two five-gallon buckets. Alvarado searched the interior of the cab but did not find any tools or equipment that would have allowed Martinez-Montelongo and Saldana to access or remove the concealed compartments in the fuel tanks.

In total, the twenty-two buckets of liquid extracted from the fuel tanks weighed 414.36 kilograms, and the liquid was determined to be 56% liquid methamphetamine, based on eleven samples tested at a Drug Enforcement

Administration Laboratory. Special Agent John Condon of Homeland Security Investigations ("HSI") testified that liquid methamphetamine is typically used for "transportation purposes" because it can be transported in all manner of vessels. Once the liquid is transported to its final destination, it is "cooked" into solid crystal methamphetamine, which dealers then sell. According to Condon, the seized methamphetamine would be valued at: approximately $209,000 in Monterrey, Mexico; approximately $533,000 in Laredo, Texas; and approximately $875,000 in Kansas City, Missouri. Condon further testified that he has "seen circumstances where" drivers who transported drugs "might have not known" that they were doing so, but he also confirmed that it likely would be easier for a driver to be aware so that they could take precautions to avoid detection.

HSI Special Agent Edgar Flores was called to the Columbia Solidarity Bridge Port of Entry to investigate because he had prior experience investigating methamphetamine smuggling in diesel tanks. Flores inspected the truck on site and again later at the Apple Towing yard, where CBP keeps seized vehicles. Flores observed that the fuel gauge read three-quarters full, even though the fuel tanks had been removed. In the cab of the truck, Flores found a stick that was dirty and smelled of diesel.

Flores also interviewed Martinez-Montelongo and Saldana individually. Flores testified that Martinez-Montelongo and Saldana both confirmed that they had monitored the fuel level with the stick, rather than relying on the fuel gauge. Both men initially stated that they were driving to Laredo to pick up "a load" that they would take back to Mexico. However, both also later changed their story to state that they were going to drive a load of "disposables" from Laredo to Kansas, where they would exchange the load for "bulk cash" to bring back to Mexico. Flores further testified that Martinez-Montelongo stated that he had been given a pickup location in Laredo by Alan, the man who had hired him. Martinez-Montelongo also told

Flores that it was Alan who told him to measure the fuel with a stick. According to Flores, Martinez-Montelongo stated that he was to be paid $6,000 for the trip, while Saldana stated that he was to be paid only $3,500.

Flores testified that Saldana told him Alan had shown Martinez-Montelongo where compartments for storing the cash were in the tractor-trailer. According to Flores, Saldana "seem[ed]" to understand that transporting the U.S. currency to Mexico was illegal. Flores further testified that Saldana stated Martinez-Montelongo had appeared nervous when the tractor-trailer was referred for secondary inspection and that when Saldana asked why, Martinez-Montelongo said it was because he had never been to prison.

Flores also testified that he searched both defendants' phones. Martinez-Montelongo's cell phone included messages received from a contact called "Alan" providing the address for a company called WWL Express in Laredo, at 407 Interamerica Boulevard. Martinez-Montelongo received multiple texts from this contact between 7:25 and 10:19 p.m., after he and Saldana had been stopped, asking him what was going on. On Saldana's phone, Flores found a conversation between Saldana and Martinez-Montelongo on the messaging application WhatsApp, but he did not find this conversation on either of Martinez-Montelongo's two cell phones. The conversation extended over a period of approximately six days preceding their border crossing on November 28. Although none of the messages explicitly referenced drugs, Flores interpreted the conversation as a discussion concerning preparations for a drug smuggling operation.

Flores testified that he investigated the Laredo address for WWL Express sent to Martinez-Montelongo by Alan and that he and Condon interviewed the people working at that address. Multiple businesses operated at that address, including WWL Express and Cava Carriers. The

government called four witnesses associated with these companies: Erika Hinojosa, former Safety Coordinator for WWL Express; Monica Salinas, Operations Manager for WWL Express; Reynaldo Gonzalez, co-owner of WWL Express; and Carlos Canales, owner of Cava Carriers. Neither Hinojosa, who was responsible for hiring and managing drivers for WWL Express, nor Salinas, who handled customer service and dispatching drivers, recognized either defendant. Gonzalez and Canales also testified that they did not know Saldana or Martinez-Montelongo. Gonzalez testified that WWL Express does not typically allow drivers to pick up loads after hours, although they do so on rare occasions, and that WWL Express's location at 407 Interamerica Boulevard is generally locked after 6:00 p.m. Similarly, Canales testified that, in rare instances, Cava Carriers would allow load drop-offs after hours and that, in those instances, mechanics working for WWL Express would receive the loads and place them on the loading docks. Neither WWL Express nor Cava Carriers was scheduled to assist with an after-hours load pickup on November 28, 2022.

Flores also testified regarding the TECS alert on the tractor-trailer, which had prompted Vila Cruz to send the tractor-trailer for inspection. He stated that the truck had been flagged because it had been used previously by Rolando Garza-Aguirre to cross the border, and Garza-Aguirre was later apprehended smuggling liquid methamphetamine in the fuel tanks of a different truck. According to Flores, the truck also had been flagged because it was owned by a company called Express International Group, whose name had come up previously in Flores's drug smuggling investigation. Although Express International was purportedly a shipping company, Flores testified that its registered address was a shopping center, rather than a warehouse, and its registered phone was not operational.

The government also called Garza-Aguirre as a witness. Garza-Aguirre testified that he had been arrested while attempting to smuggle liquid

methamphetamine into the United States by hiding it in the divided fuel tanks of the truck he was driving. Garza-Aguirre explained that he had pleaded guilty to a federal drug distribution charge and acknowledged that he was testifying at Saldana and Martinez-Montelongo's trial in exchange for the government's recommendation of a shorter sentence. Garza-Aguirre testified that he knew the people he was working with in the drug trafficking business, including Alan. He confirmed that Alan's real name is Umberto Hernandez Gonzalez and that he owned the subject truck with Juan Garcia. "Alan" and Juan had hired Garza-Aguirre to transport liquid methamphetamine on several occasions, and Garza-Aguirre was always made aware that he was tasked with transporting drugs. According to Garza-Aguirre, Express International sometimes moved legitimate loads, in addition to smuggling drugs. Garza-Aguirre also stated that he did not know Saldana or Martinez-Montelongo.

Garza-Aguirre further testified that, at the time he was arrested, he had agreed to transport the liquid methamphetamine to Houston—a one-day trip—for $10,000. He explained that, with the divided fuel tanks, he was required to refuel several times and that he would check the fuel levels with a stick because the fuel gauge did not work. On cross-examination, he agreed that trucks in Mexico are not as well-maintained as trucks in the United States, but he noted that it still would be rare for a Mexican truck driver to check fuel levels with a stick. According to Garza-Aguirre, he had driven the subject truck across the border on two or three trips before it was driven across by Martinez-Montelongo with Saldana on November 28, 2022. At the time Garza-Aguirre had driven the truck, it had been blue, and the concealed compartments had been filed with water, rather than liquid methamphetamine. Although the truck Martinez-Montelongo was driving was white, Garza-Aguirre recognized the interior as the interior of the blue truck and suggested that the subject truck had been painted, as evidenced by

a small patch of blue paint observed on the exterior of the vehicle. Garza-Aguirre explained that the subject truck had divided fuel tanks, like the one he was driving at the time he was arrested.

B

On December 13, 2022, a federal grand jury returned an indictment charging Saldana and Martinez-Montelongo with conspiracy to import fifty grams or more of methamphetamine in violation of 21 U.S.C. §§ 963, 952(a), 960(a)(1) and (b)(1)(H) (Count 1) and importation of fifty grams or more of methamphetamine in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and (b)(1)(H) and 18 U.S.C. § 2 (Count 2). Saldana and Martinez-Montelongo pleaded not guilty to both counts and exercised their right to a jury trial.

The district court's minute entry for the last day of the trial indicates that, after the government rested, both Saldana and Martinez-Montelongo orally moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The minute entry further indicates that the district court denied both motions. Both defendants then rested without putting on evidence of their own. After deliberating, the jury convicted Saldana and Martinez-Montelongo on both counts.

In advance of sentencing, neither the government nor either defendant objected to his respective Presentence Investigation Report ("PSR") prepared by the Probation Office. During a combined sentencing hearing, the district court sentenced both defendants to 235 months as to each count, to run concurrently, for a total of 235 months of imprisonment. Saldana and Martinez-Montelongo timely appealed. We have jurisdiction over this appeal under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

No. 24-40031
c/w No. 24-40047

II

A

We turn first to Saldana's sufficiency challenge.

As all parties repeatedly expressed at trial, the question of the defendants' knowledge was the crux of the case. Saldana did not dispute that he rode as a passenger in a tractor-trailer that Martinez-Montelongo drove into the United States from Mexico or that the tractor-trailer was carrying a large quantity of liquid methamphetamine. Rather, defense counsel argued that Saldana was unaware of the methamphetamine and that the government could not prove knowledge beyond a reasonable doubt. In his briefing on appeal, Saldana argues that the government's evidence was insufficient to show that Saldana "knowingly join[ed] a conspiracy to import methamphetamine" (Count 1) or "knowingly imported or played a role in the importation of methamphetamine" (Count 2).

1

The parties dispute whether Saldana's sufficiency challenge was preserved and, consequently, which standard of review applies. After the close of the government's case at trial, both defendants rested without testifying or calling any additional witnesses. The minute entry entered on the district court docket for the last day of the trial states that both defendants moved for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure and that the district court denied both motions for the reasons stated on the record. However, the transcript for the last day of trial does not contain the parties' arguments and the court's rulings on those motions.

Dismissing the value of the minute entry, the government asserts that "there is no evidence in the record that a hearing on the motion occurred."

9

No. 24-40031
c/w No. 24-40047

The government contends—without further analysis or legal argument—that "[b]ecause there is no evidence of the hearing in the trial transcript, Saldana did not preserve his objection to his convictions and plain error applies."

We disagree.  As Saldana highlights, the minute entry for the last day of trial states in relevant part: "Bench Conference held 11:33 AM - (01) Noe Martinez-Montelongo[']s Rule 29 Motion for Judgment of Acquittal - DENIED by the Court (reasons on the record). Defendant (02) Fidel Saldana Rodriguez[']s Rule 29 Motion for Judgment of Acquittal - DENIED by the Court (reasons on the record)."  This comports with the trial transcript, which demonstrates that counsel for Martinez-Montelongo brought up Rule 29 motions shortly after the government's last witness testified.  The district court stated that it would work Rule 29 proceedings into its plan for the remainder of the trial, and the trial transcript reflects that, sometime after 11:32 a.m., the district court asked counsel to approach and there was a "discussion at bench between counsel and Court."  Although the Rule 29 hearing does not appear thereafter in the trial transcript, the minute entry entered by the district court specifically states that both defendants moved for judgment of acquittal pursuant to Rule 29 and that the court orally denied both motions.

Saldana also suggests a reasonable explanation for the trial transcript's omission.  He highlights that there was no court reporter present for this trial; rather, the trial audio was recorded and later transcribed into a written transcript.  Saldana posits that the recorder was likely turned off after the court had excused the jury and had discussed  with the defendants their plan to make Rule 29 motions, and that the recorder was likely not turned on again until after the defendants formally made, and the district court denied, the Rule 29 motions at a bench conference.  In sum, all the available record

evidence supports Saldana's position that he made a Rule 29 motion, which the district court denied, and therefore that his challenge was preserved.

"We review preserved challenges to the sufficiency of the evidence de novo, but we are 'highly deferential to the verdict.'" *United States v. Scott*, 892 F.3d 791, 796 (5th Cir. 2018) (quoting *United States v. Velasquez*, 881 F.3d 314, 328 (5th Cir. 2018) (per curiam)). "[I]t is not the reviewing court's role to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt,' but to ask, instead, 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Terry v. Hooper*, 85 F.4th 750, 754 (5th Cir. 2023) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)), *cert. denied*, 144 S. Ct. 1074 (2024).

2

To convict Saldana on Count 1 (conspiracy to import methamphetamine), the government was required to prove: "(1) the existence of an agreement to import or to possess with intent to distribute; (2) knowledge of the agreement; and (3) voluntary participation in the agreement." *United States v. Rodriguez-Mireles*, 896 F.2d 890, 892 (5th Cir. 1990). On Count 2 (importation of methamphetamine), the government was required to prove: "(1) the defendant played a role in bringing a quantity of a controlled substance into the United States from outside of the country; (2) the defendant knew the substance was controlled; and (3) the defendant knew the substance would enter the United States." *United States v. Moreno*, 185 F.3d 465, 471 (5th Cir. 1999).

As noted above, Saldana contests the sufficiency of the evidence only as to the knowledge element of both counts of conviction. Namely, he asserts that the government's evidence was insufficient to conclude that he was

aware that there was methamphetamine concealed in the truck's fuel tanks. "Ordinarily, knowledge of the existence of drugs may be inferred from control over the location in which they are found." *Id.* at 471; *see also United States v. Mendoza*, 522 F.3d 482, 489 (5th Cir. 2008). However, where, as here, "the drugs are secreted in a hidden compartment," the court "require[s] 'additional circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge.'" *Moreno*, 185 F.3d at 471 (quoting *United States v. Ortega Reyna*, 148 F.3d 540, 544 (5th Cir. 1998) (per curiam), *abrogated in part on other grounds by United States v. Vargas-Ocampo*, 747 F.3d 299 (5th Cir. 2014) (en banc)). This standard recognizes that "it is at least a fair assumption that a third party might have concealed the controlled substances in the vehicle with the intent to use the unwitting defendant as the carrier in a smuggling enterprise." *United States v. Diaz-Carreon*, 915 F.2d 951, 954 (5th Cir. 1990). Circumstantial evidence demonstrating guilty knowledge may include:

> (1) nervousness; (2) absence of nervousness, i.e., a cool and calm demeanor; (3) failure to make eye contact; (4) refusal or reluctance to answer questions; (5) lack of surprise when contraband is discovered; (6) inconsistent statements; (7) implausible explanations; (8) possession of large amounts of cash; and (9) obvious or remarkable alterations to the vehicle, especially when the defendant had been in possession of the vehicle for a substantial period of time.

*Ortega Reyna*, 148 F.3d at 544 (footnotes omitted).

Saldana argues that, while there may be sufficient circumstantial evidence demonstrating Martinez-Montelongo's guilty knowledge, this evidence is insufficient to convict Saldana. For example, Saldana highlights that there was no indication he was nervous when the tractor-trailer was referred for inspection; instead, Saldana told HSI Special Agent Flores that Martinez-Montelongo had appeared nervous and that when Saldana asked

why, Martinez-Montelongo said it was because he had never been to prison. The government seems to suggest that because Martinez-Montelongo and Saldana were communicating with and working for Alan—whom the government describes as a "known drug smuggler"—they must have been aware that they were being hired to smuggle drugs. But as Saldana underscores, the text messages between Martinez-Montelongo and Alan, the WhatsApp messages between Martinez-Montelongo and Saldana, and both defendants' statements to Flores, all suggest that Martinez-Montelongo primarily handled communications with Alan on his own and then conveyed the information (including the WWL address, the location of the cash compartments, and the broken fuel gauge) to Saldana.

Moreover, Garza-Aguirre testified that Alan's company, Express International, sometimes moved legitimate loads, in addition to smuggling drugs, and there is no evidence in the record indicating one way or the other whether Saldana knew that Alan was a drug smuggler. CBP Officer Alvarado testified that there was nothing visually irregular about the fuel tanks that would have alerted Saldana to the liquid methamphetamine inside. And although Saldana admitted that Martinez-Montelongo had told him the truck contained concealed compartments for cash, nothing in Saldana's statements to Flores or in his WhatsApp messages with Martinez-Montelongo explicitly referenced drugs.

Both parties highlight Saldana's payment for the trip, though they draw different inferences. The government argues that the "jury reasonably concluded a drug smuggler would not pay an 'innocent' passenger." But Martinez-Montelongo's pay rate was nearly double Saldana's, and Saldana argues that the disparity suggests that only Martinez-Montelongo was aware of the drug smuggling and accordingly was paid more. Similarly, the government argues that "the high value of the methamphetamine is compelling evidence that supports Saldana's conviction." *See United States*

*v. Villarreal*, 324 F.3d 319, 324 (5th Cir. 2003) ("One example of circumstantial evidence which may be probative of knowledge is the value of the drug being transported."). Again, Saldana suggests that this evidence supports Martinez-Montelongo's conviction, not Saldana's, because it is not "implausible" that Alan would have put Martinez-Montelongo in charge of the methamphetamine, while leaving Saldana an unknowing accomplice.

The government asserts that the "most compelling evidence that supports Saldana's knowledge of the conspiracy are the WhatsApp messages between Martinez-Montelongo and Saldana." Although the messages make no explicit reference to drug smuggling, Flores testified that, based on his experience as an investigator, he interpreted their conversation as referencing their preparations for a drug smuggling operation. For example, one audio message used the word "solo," which Flores interpreted to indicate that Saldana and Martinez-Montelongo were confirming that the smuggling route was clear of law enforcement. In another translated message, Martinez-Montelongo told Saldana that he had informed Alan that "it needed to be a legal load with proper weight." Flores interpreted the phrase "proper weight" (or "best weight," as Flores translates) to refer to the drugs that they would be smuggling. The messages also include references to trips to Atlanta and Houston, which Flores and Condon identified as hub cities for narcotics trafficking. Saldana counters that this entire conversation merely shows the defendants planning for a legitimate trip, with "solo" referring to a lack of traffic and "weight" referring to the weight of the truck—both common concerns for truckers carrying legitimate loads. Though both parties offer reasonable inferences, deciding which inference to credit is a quintessential question for the jury to resolve.

The government also emphasizes Saldana's inconsistent statements to Flores. After first stating that he and Martinez-Montelongo were picking up a load in Laredo and then returning to Mexico, Saldana later told Flores

that they were taking the load from Laredo to Kansas, where they would exchange the load for cash before returning to Mexico. As the government argues, such inconsistent statements can be viewed as "inherently suspicious," allowing the factfinder to "reasonably conclude that they mask[ed] an underlying consciousness of guilt." *Diaz-Carreon*, 915 F.2d at 955; *see also id.* at 954–55 ("Perhaps the strongest evidence of a criminal defendant's guilty knowledge is inconsistent statements to federal officials."). Saldana suggests that these inconsistent statements are evidence only that Saldana was aware that smuggling currency was illegal. But while that is one reasonable inference, it is not the only one. The jury could reasonably have inferred that Saldana's changing statements, including his admission that he planned to smuggle currency, were an effort to explain his arguably suspicious behavior while distancing himself from the drug smuggling operation.

Two additional significant pieces of evidence supporting the jury's verdict are the broken fuel gauge, requiring the use of a stick to measure the fuel levels, and Garza-Aguirre's testimony on that subject. Saldana admitted to Flores that he and Martinez-Montelongo had been told to monitor the fuel level with a stick, rather than relying on the fuel gauge. And although Garza-Aguirre acknowledged that trucks are less well-maintained in Mexico, he expressed that it still would be "rare" for a truck driver carrying a legitimate load to have to check a truck's fuel levels with a stick. Moreover, Garza-Aguirre explained that, with the divided fuel tanks, he was required to refuel several times on a cross-border trip. With this context, it would be reasonable for a jury to conclude that Saldana, a professional truck driver, would have been aware that the tanks had been altered to carry less fuel and therefore to infer that Saldana was aware that the tanks also carried liquid methamphetamine in concealed compartments.

Taking all of this evidence together, Saldana is correct that the evidence adduced at trial could reasonably support the conclusion that Saldana was an unwitting participant in Alan and Martinez-Montelongo's drug smuggling operation. But the mere fact that the evidence is capable of another construction is insufficient to support a reversal. This court *must* affirm if, "after viewing the evidence in the light most favorable to the prosecution," it concludes that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Terry*, 85 F.4th at 754 (emphasis in original) (quoting *Jackson*, 443 U.S. at 318–19). It is for this reason that "[a] defendant seeking reversal on the basis of insufficient evidence swims upstream." *United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020) (quoting *United States v. Mulderig*, 120 F.3d 534, 546 (5th Cir. 1997)).

Here, despite Saldana's well-taken arguments, there are multiple pieces of evidence that a jury reasonably could conclude establish the requisite guilty knowledge. *See United States v. Barnes*, 803 F.3d 209, 217 (5th Cir. 2015) ("[T]he jury holds the ultimate responsibility for evaluating the reliability of the evidence."); *United States v. Delgado*, 668 F.3d 219, 225 (5th Cir. 2012) ("The jury is free to choose among reasonable constructions of the evidence and the evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." (citation omitted)). Viewed together, in the light most favorable to the government, this body of evidence appears sufficient for a reasonable jury to conclude that Saldana knowingly participated in a conspiracy to import methamphetamine and knowingly imported methamphetamine. Therefore, the district court did not err in denying Saldana's motion for judgment of acquittal.

No. 24-40031
c/w No. 24-40047

B

We now turn to Martinez-Montelongo's challenge to the reasonableness of his sentence.

At the sentencing phase, Martinez-Montelongo stated no objections to the PSR. In keeping with the PSR, the district court calculated the applicable Guidelines sentencing range as 235 to 293 months of imprisonment. Martinez-Montelongo asked the district court to impose a below-Guidelines sentence of 120 months, the mandatory minimum, primarily based on his personal characteristics, family circumstances, and lack of criminal history. The district court declined to vary downward, instead imposing a sentence of 235 months of imprisonment, representing the low end of the Guidelines range, followed by five years of supervised release. Martinez-Montelongo challenges his sentence on the basis that it is substantively unreasonable because the district court improperly considered and gave weight to Martinez-Montelongo's failure to admit guilt when conducting its § 3553(a) analysis.

1

The parties agree that Martinez-Montelongo preserved his sentencing challenge by seeking a below-Guidelines sentence before the district court. This court "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007). If we determine "that the district court's sentencing decision is procedurally sound, [we] should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Id.*

17

No. 24-40031
c/w No. 24-40047

This court "presume[s] sentences within or below the calculated guidelines range are reasonable." *United States v. Simpson*, 796 F.3d 548, 557 (5th Cir. 2015); *see also United States v. Cisneros-Gutierrez*, 517 F.3d 751, 766 (5th Cir. 2008). Still, a defendant "can rebut the presumption that this sentence is reasonable by demonstrating that the sentence: '(1) does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors.'" *Simpson*, 796 F.3d at 558 (quoting *United States v. Warren*, 720 F.3d 321, 332 (5th Cir. 2013)).

2

Martinez-Montelongo argues that the district court violated his Fifth Amendment privilege against self-incrimination by relying on Martinez-Montelongo's failure to admit guilt when conducting the § 3553(a) analysis. For its part, the government "agrees with Martinez-Montelongo that the district court relied on Martinez-Montelongo maintaining his innocence rather than accepting responsibility or expressing remorse," but nonetheless asserts that the district court did not abuse its discretion because it merely considered this as one factor among others and did not suggest it was punishing Martinez-Montelongo for his perceived lack of remorse.

Because the parties apparently agree that the district court relied on Martinez-Montelongo's insistence on his innocence, their disagreement focuses on whether such reliance is an abuse of discretion. Martinez-Montelongo's legal argument rests almost exclusively on *United States v. Laca*, 499 F.2d 922 (5th Cir. 1974). As here, the defendants in *Laca* were convicted following a jury trial but maintained their innocence. *Id.* at 924, 927. At sentencing, the district court remarked:

> None of you have shown any inclination toward repentance or trying to cooperate with the authorities to clear up any of these

No. 24-40031
c/w No. 24-40047

matters. . . . The attorneys can file motions for reduction and if
your attitude changes and if you try to clear up these matters
the Court can re-consider, but at this time I have no intention
of re-considering this sentence because, as I said, it is very
aggravated and there is no showing of any repentance on the
part of any of you.

*Id.* at 927.  Our court vacated the defendants' sentences, holding that, "by
opining that these defendants had not shown an inclination towards
repentance, the court erred by predicating the length of these sentences on
whether the defendants had confessed their crimes." *Id.* "This conditioning
of sentences on defendants' confessions violated their right to avoid self-
incrimination under the Fifth Amendment." *Id.* Martinez-Montelongo
argues that this is "precisely what occurred in the instant matter" and,
therefore, that *Laca* requires reversal here.

The government attempts to distinguish *Laca* on the facts. It
highlights that the *Laca* defendants were given notably long prison sentences
and that the district court here, unlike in *Laca*, conducted a detailed § 3553(a)
analysis, meaning that it "did not exclusively rely on the fact that Martinez-
Montelongo did not accept responsibility for his actions." However, neither
of these asserted distinctions finds support in *Laca*. As to the second point,
*Laca* contains no suggestion that a district court must exclusively rely on a
defendant's failure to repent for that reliance to amount to an abuse of
discretion. As to the first point, the government appears to misapprehend
the court's discussion of *United States v. Moore*, 427 F.2d 38 (5th Cir. 1970).

The court in *Laca* noted that our court had not found a Fifth
Amendment violation in *Moore*, where the district court had imposed only a
thirteen-month sentence instead of a possible fifty-month sentence. *Laca*,
499 F.2d at 928.  The government apparently reads this to mean that a district
court may rely on a defendant's refusal to confess or repent when sentencing

a defendant so long as the sentence imposed is not too substantial. But this is a misreading of *Laca*. In *Moore*, the court concluded that Moore's "mild" sentence did not "demonstrate any pique or personal animosity on the part of the trial judge" and that "the sentencing proceedings read as a whole indicate that the court was motivated only by a proper concern for the due administration of justice." *Moore*, 427 F.2d at 42. Thus, *Moore* is distinguishable from *Laca* because the court in *Moore* found that the district court had not been influenced by the defendant's failure to repent, as evidenced by the relatively short sentence. This is the distinction observed by the court in *Laca*; it does not support the government's position that a district court may permissibly "rel[y] upon a defendant's lack of remorse as a sentencing factor" when sentencing a defendant who has consistently maintained his innocence.

The government also identifies—but does not analyze—five decisions that it suggests are analogous, *id.*: *United States v. Willis*, 76 F.4th 467 (5th Cir. 2023); *United States v. Kippers*, 685 F.3d 491 (5th Cir. 2012); *United States v. Douglas*, 569 F.3d 523 (5th Cir. 2009); *United States v. Duran-Munez*, 539 F. App'x 407 (5th Cir. 2013) (per curiam); and *United States v. Varela*, 406 F. App'x 827 (5th Cir. 2010) (per curiam). But these decisions do not support the government's position either. In contrast to Martinez-Montelongo, the defendants in each of these cases had pleaded guilty such that the Fifth Amendment's protection against self-incrimination was not implicated as it was in *Laca*. *See, e.g.*, *Duran-Munez*, 539 F. App'x at 408 ("Duran's Fifth Amendment privilege was not at issue; he had pleaded guilty to and had been sentenced for the aggravated kidnapping offense.").

However, we need not conclusively decide whether *Laca* bars a district court from relying on a defendant's lack of remorse as part of its § 3553(a) analysis if the defendant has consistently maintained his innocence. Although the parties apparently agree that "the district court relied on

Martinez-Montelongo maintaining his innocence rather than accepting responsibility or expressing remorse when imposing his sentence," the sentencing transcript and written judgment do not support that conclusion. Although the district court repeatedly references both the defendants' continued insistence on their innocence and the court's belief in their guilt, these references are best read as the district court's explanation for (1) why the court was sentencing the defendants at all, even though they maintained their innocence, and (2) why the defendants were not eligible to receive the benefits of the "safety valve" and "acceptance of responsibility" Guidelines provisions.

The first point is best captured in the following excerpt from the sentencing transcript:

> You know, I will tell you that I presided over the trial and, you know, I think back on when [former S. D. Tex.] Judge [George] Kazen would sentence people after a trial and he would comment on, "If I were sentencing an innocent person, it would be a great injustice." I have no doubt in my mind that I am sentencing individuals who are guilty. I presided over the evidence. The evidence was strong. You have every right to maintain your innocence. You know, there are different reasons why individuals do that, but I feel, as someone who has presided over many trials over the past 13 years as a district judge and who, you know, was a magistrate judge before that for five years, you know, that the evidence was more than sufficient to demonstrate knowledge on both of your parts. So, you know, and that's why I'm saying, okay, you want to maintain your innocence, and that is your right to do that.

Martinez-Montelongo identifies this passage as an example of the district court's punishing him for maintaining his innocence. However, a close reading of the passage demonstrates the opposite. The district court reaffirmed twice that it was the defendants' right to maintain their innocence.

But, reflecting on Judge Kazen's words, the court further explained that it would nonetheless sentence the defendants because it believed that they were guilty.

As to the second point, Martinez-Montelongo has never argued, before the district court or this court, that his offense level or sentence should be reduced based on either the "safety valve" provisions or the "acceptance of responsibility" provision. As the district court appropriately expressed, these provisions are inapplicable because Martinez-Montelongo pleaded not guilty, pursued a jury trial, and maintained his innocence thereafter. *See* U.S.S.G. § 5C1.2 (providing that, for certain offenses, "the court shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence, if the court finds that the defendant meets the criteria in 18 U.S.C. § 3553(f)(1)–18 U.S.C. § 3553(f)(5)"); *id.* § 2D1.1(b)(17) ("If the defendant meets the criteria set forth in paragraphs (1)–(5) of subsection (a) of §5C1.2 . . . , decrease [the offense level] by 2 levels."); *id.* § 3E1.1(a) ("If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."); *id.* § 3E1.1 cmt. n.2 ("This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.").

At no point in the sentencing transcript does the court indicate that it imposed a higher sentence because Martinez-Montelongo refused to express guilt or remorse. Indeed, although the government's efforts to distinguish *Moore* from *Laca* are misguided, the instant case is best analogized to *Moore*. Although a 235-month sentence is by no means short, it is the lowest possible Guidelines sentence that Martinez-Montelongo could have received—nearly five years shorter than the high end of the Guidelines range and substantially shorter than the statutory maximum of life imprisonment. Thus, as in *Moore*,

Martinez-Montelongo's sentence does not "demonstrate any pique or personal animosity on the part of the trial judge," and "the sentencing proceedings read as a whole indicate that the court was motivated only by a proper concern for the due administration of justice." *Moore*, 427 F.2d at 42.

Because we conclude that the district court did not rely on Martinez-Montelongo's lack of remorse in its § 3553(a) analysis, Martinez-Montelongo fails to rebut the presumption that his within-Guidelines sentence was reasonable. *See Simpson*, 796 F.3d at 557.

## III

For the foregoing reasons, we AFFIRM Saldana's convictions and AFFIRM Martinez-Montelongo's sentence.